Russell McDANIEL, Plaintiff,

v.

**MISSISSIPPI BAPTIST MEDICAL CENTER, Defendant.**

**Civ. A. No. 3:93–CV–604(B)(N).**

United States District Court,
S.D. Mississippi,
Jackson Division.

March 1, 1995.

Nunc Pro Tunc Dec. 23, 1994.

Lindsay C. Patterson, Ott, Purdy & Scott, Jackson, MS, for plaintiff Russell L. McDaniel.

Walter J. Brand, Kenneth E. Milam, Watkins & Eager, Jackson, MS, for defendant Mississippi Baptist Medical Center.

## BENCH OPINION (EDITED)

BARBOUR, Chief Judge.

### Introduction

On December 23, 1994, this Court rendered its bench opinion in this case. A transcript of that opinion was prepared and filed by the court reporter pursuant to the Notice of Appeal filed by Plaintiff. Since that time, the Defendant has suggested that the opinion of the Court is worthy of publication because it deals with issues of first impression under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, and because such publication would compliment the Court's ruling on Motion for Summary Judgment which was previously published as *McDaniel v. Mississippi Baptist Medical Center,* 869 F.Supp. 445 (S.D.Miss.1994). The Court agrees and has edited its bench opinion for that purpose. The Clerk of Court is directed to file this edited opinion and to forward it to the Court of Appeals for the Fifth Circuit as a part of the file.

### RULING OF THE COURT

The Court has conducted a bench trial of this matter and has considered the testimony, the other evidence presented into the record, the briefs and the closing arguments of counsel. The Court is now prepared to enter its opinion by way of these findings of fact and conclusions of law. In the event these findings of fact and conclusions of law are later transcribed for appeal or other purposes, the Court will reserve the right to edit or amend them and place them in final form thereby.

This case is brought under the Americans with Disabilities Act (the "ADA"). The Plaintiff is a recovering chemically dependent person. In the summer of 1991 he was hired by the Defendant, Mississippi Baptist Medical Center, as an adolescent marketing representative for the Chemical Dependency Center of the Defendant. The Defendant will be referred to in this opinion as "CDC."

Russell McDaniel, who is now thirty years of age, has been chemically dependent since his teenage years. When he was nineteen years old he went into a resident treatment program for his dependency upon alcohol, marijuana and cocaine. Since that time he has been a recovering chemically dependent person.

Prior to August of 1992, the Plaintiff had had a series of uses of various prescription drugs which come under the umbrella of controlled substances under the Controlled Substances Act. He was in an automobile accident and was prescribed pain killers for that. He had some dental work done and received some controlled substances in re-

gard to that. He claims to have had an episode of abdominal or chest pain, which was never firmly diagnosed by his doctor, and was hospitalized and received pain medication for that. Apparently each of these uses of prescribed drugs caused the Plaintiff at least in some degree to relapse in his recovery process.

Prior to August of 1992, as the Plaintiff was approaching his first year anniversary as an employee of the CDC, he was caught by his wife with some pain killers which had been prescribed for her. The testimony is unclear as to whether, at the time he was caught, the Plaintiff had only physically removed the bottle with the pills in it from his wife's bedside table or whether he had actually ingested some of those particular drugs. The Court recalls those to have been Darvocet. At any rate, his wife, on the day she caught him with the pills, confronted the Plaintiff. This precipitated the Plaintiff's admitting to himself that, in his words, he was "out of control" in regard to his relapse and in active chemical dependency. As a result of this, and through discussions with his wife, he decided to get help. Since he worked for an employer which was in the business of giving treatment to chemically dependent persons, and since he knew counselors in that program, he went and talked with Joanne Hartwig, a counsellor with the CDC. He also talked with Thomas Mitchell, his supervisor, and eventually he also talked with Pete Couch, the director of the CDC.

In these meetings he voluntarily disclosed the fact that he was in relapse. Those people advised him and encouraged him to seek inpatient treatment for his relapse, and he decided to go to a place called the Friary, Incorporated, at Gulf Breeze, Florida. The discussions with the CDC employees occurred during the few days preceding his admission to the Friary on September 1, 1992. He was released from the Friary on September 19, 1992.

The Plaintiff clearly admitted at that time and has since admitted and has been forthright throughout these proceedings that he is a chemically dependent person, that he was in relapse during the months of August and September of 1992, and that his relapse was out of control. He further has admitted that his use of drugs as prescribed by those doctors was at least in part brought about by his misrepresentation, fraud, deception or subterfuge in regard to his exaggeration of his pain and other symptoms as related to the prescribing physicians or dentists. The Court in its opinion and order on summary judgment, previously entered in this case on November 29, 1994, specifically found that the Plaintiff had engaged in illegal use of drugs because of his misrepresentation, fraud, deception or subterfuge in employing them. The Court has revisited that question in view of the evidence presented during the case and finds that indeed the Court was correct in reaching the conclusion that the drug use was illegal as set forth in that earlier opinion.

The testimony is in considerable disagreement as to what action was taken by the Defendant upon its learning of the Plaintiff's relapse and when it took that action. The Plaintiff's contention is that he self-reported his relapse to his employer and voluntarily went into treatment with the encouragement of the employer, and that it was not until a counselor at the Friary contacted Mr. Couch at the CDC during the period of his treatment that there was any mention that he was being terminated from his job.

The Plaintiff further testified that he did not know he was terminated from his job until he returned to his place of employment on Monday, the day after he was released from the Friary on Friday, September 29, 1992, at which time Mr. Couch met him at the entrance way or in the reception area with a pink slip and advised him that he was terminated and that he should go to the personnel office and execute the proper paperwork required by the hospital. Mr. Couch agrees that he did in fact meet the Plaintiff on that day with the pink slip. The Plaintiff then saw Jeff Carter of the Human Resources Department and executed various papers.

The Plaintiff then went to see his wife at her place of employment. His wife looked at the pink slip or personnel form and noticed that it stated on there that the Plaintiff had resigned his position. After she questioned

him about that, the Plaintiff decided to go back to Mr. Carter's office and inquire as to why the form had been written up in that manner when in fact he had not resigned but had been terminated. After discussions, Mr. Carter suggested that he could change the action to reflect that the Plaintiff had been given a medical leave of absence as opposed to showing that he had resigned. This would give the Plaintiff the benefit of being able to continue medical insurance for some short period of time until he could find other medical insurance coverage. Because of all of this, the Plaintiff claims that the adverse job action that was taken against him was termination, and that that did not occur until the end of September, 1992.

Defendant, on the other hand, has presented evidence that it has a one year's sobriety policy for the CDC. That policy requires its employees who deal directly with patients to have remained drug free for at least one year prior to employment and thereafter during employment. Defendant claims that pursuant to the sobriety policy it terminated the Plaintiff on the day that the Plaintiff revealed to the CDC director, Pete Couch, that he had relapsed. This day was a day or so before he went to the Friary on September 1st.

The Defendant argues, alternatively, that if it did not terminate the Plaintiff at that time, that the Plaintiff clearly was placed on notice that he could not return to his job as a marketer for the CDC, and that, at best, Defendant would attempt to find him employment in another area with the Defendant. Defendant argues that this notification would amount to either a demotion or a transfer out of the unit and would therefore constitute an adverse job action and that this action occurred before the Plaintiff went into treatment.

There is a considerable amount of disagreement in the testimony as to whether the Defendant actually had a sobriety policy

in effect at the time of the adverse action against the Plaintiff. It is clear that there was no written sobriety policy. There was a written policy in the policy manual which prevented substance abuse while on the job. The Defendant did not terminate the Plaintiff because of violation of this policy. The Plaintiff was terminated, according to the Defendant's position in this lawsuit, under the sobriety policy because he had not maintained his sobriety during his employment. This existence of this sobriety policy was testified to by Joanne Hartwig and by Pete Couch. The weakness, from the Defendant's standpoint, is that when Mr. McDaniel went to see Jeff Carter in Human Resources, Mr. Carter told him that he did not know about the policy at the CDC and that he would check into it. Ms. Hartwig and Mr. Couch both testified that the policy was an oral policy and was so understood in the unit. The Plaintiff testified that he had never heard of it. Also the Plaintiff's supervisor, Thomas Mitchell, testified that he was unaware of the policy except when it was mentioned by Ms. Hartwig during the meeting that Ms. Hartwig and Mr. Mitchell had with the Plaintiff immediately before the Plaintiff went into the Friary.

This case presents issues under the relatively new ADA. The effective date of the ADA was July 22, 1992, approximately one month prior to the events which precipitated this lawsuit. Accordingly, at the time that these events took place this new and far reaching act had just become effective. As of the date of this opinion, approximately two years later, there still has been a very minimal amount of litigation under the Act. This case not only presents questions which are ones of first impression under the Act in general, but it also involves the exception to the definition of "qualified individuals with disability" [1] for those persons who are users of illegal drugs. Accordingly, the case is a cutting edge case.

---

1. 42 U.S.C. § 12111(8) states in pertinent part:
 The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

The parties are in agreement that a Plaintiff would be a "qualified individual with a disability" under the definition of the Act unless the Court finds that at the time of the adverse action he was "currently engaging in illegal use of drugs and that the covered entity acted on the basis of such use."[2] That is an exception to the act which otherwise defines as a qualified individual a chemically dependent person. That exception is found in Section 12114 of Title 42 of the United States Code. In this case we are dealing with an exception to that exception, Subsection (b)(2) of Section 12114, which excludes from the exception a person who is "participating in a supervised rehabilitation program and is no longer engaging in such use"[3].

In part this case turns on when the adverse action occurred. As the Court understands the Act and as it has set forth in the order on summary judgment, the Act creates a "safe harbor" for chemically dependent persons who are participating in a supervised rehabilitation program and are no longer engaging in such use. As a practical matter, the question presents itself as to whether a chemically dependent person who is employed by a covered employer and who is currently engaging in illegal drug use, can escape termination by enrolling himself in a drug treatment program before he is caught by the employer.

■ Here the Court finds that the adverse employment action, whether it was termination in its entirety or termination from this particular job, was in fact conveyed to the Plaintiff and was known by him before he went into treatment. Accordingly, the Plaintiff was not a "qualified individual with a disability" under the ADA and is not covered by it.

The testimony is clear, at least to the extent that Joanne Hartwig told the Plaintiff after he had revealed his relapse to her, that she thought he would probably be terminated from his job based upon her knowledge of

past history of similar occurrences in the CDC. Mr. Mitchell, who was Mr. McDaniel's immediate supervisor and who was very sympathetic to Mr. McDaniel and tried to assist him in every way possible with his testimony, testified that he had told the Plaintiff that he would do everything he could to find him another job at the Baptist Hospital, even if it were "frying chickens." Mr. Couch testified that he told the Plaintiff before he went into treatment that he could not come back to that job. The Court does not place a great deal of weight on the testimony of Mr. Couch in that regard.

However, there are several references in the Friary records which were introduced into evidence which clearly show that the Plaintiff, while he was at the Friary, was deeply concerned about his job, and there are indications that he believed that he had in fact been terminated. The Court concludes from all of this that the Plaintiff was in fact told before he entered treatment that he could not have the same job when he came back. Accordingly, adverse action was taken, whether it was termination of his job or whether it was advice that he would have to accept another job outside of the CDC, which would be certainly a demotion or some kind of transfer. Accordingly, the Plaintiff was not covered by the ADA.

Plaintiff has argued that under Section 12114(a) that the Defendant did not fire the Plaintiff because of his illegal drug use, but because of his violation of the sobriety policy, and therefore the action does not come within the definition set forth in that section. That section says that the term " 'qualified individual with a disability' shall not include any employee or applicant who is currently engaging in the illegal use of drugs when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a). The Plaintiff's argument might be valid if the Court found that the adverse action occurred after he entered treatment. Here it is clear that the Plaintiff

---

**2.** 42 U.S.C. § 12114(a) states in pertinent part: The term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

**3.** 42 U.S.C. § 12114(b)(2) states in pertinent part:

(2) is participating in a supervised rehabilitation program and is no longer engaging in such use;

was currently engaging in the illegal use of drugs, as admitted by him to his employers and coemployees, and that when that was discovered, the CDC terminated him on the basis of that use. Accordingly, the Defendant is entitled to be finally discharged from any liability in this lawsuit.

The Court will make alternative rulings in the event that it is in error in regard to this ruling. It will do this so that further trial might not be necessary.

If the adverse job action did not occur until after the Plaintiff entered treatment, the Plaintiff argues that he falls within the exception contained in section 12114(b)(2). That section says that a qualified individual is defined as one who, although he has been engaged in illegal drug use, is at that time "participating in a supervised rehabilitation program and is no longer engaging in such use." Here it is true that if the Court were to find that the adverse action, the termination, occurred either while he was in the Friary or upon his return, that as of either of those times the Plaintiff was participating in a supervised drug rehabilitation program.

The proof has shown that chemically dependent persons normally are treated first by an inpatient admission to a hospital or treatment center, and afterwards by a continuing, ongoing supervision program, much of which is voluntarily carried by the patient himself. Often, the ongoing supervision phase occurs through regular multi-weekly participations in AA meetings or NA meetings and usually with a personal sponsor, a fellow chemically dependent person who is in recovery, who gives ongoing support and advice. So, a supervised rehabilitation program does not necessarily mean one that is medically supervised on an in-house basis. It includes that, but certainly includes this ongoing program which many chemically dependent people continue to follow for years following their initial admission of dependency.

The Plaintiff certainly is in that position and in fact has been in that position since his release from his initial in-house treatment at age nineteen. He has been in relapse a number of times since that time, which is not unusual, but he is in a supervised rehabilita-

tion program now. He certainly was in such a program at the time he was in the Friary, and has continued in it since then.

The second portion of the exception is that he is no longer engaging in such use. The proof shows that, at least at the time he entered the Friary, the Plaintiff was drug free insofar as his system was concerned. The drug tests and records clearly showed that he was not put in a detoxification program when he arrived at the Friary.

The testimony is somewhat in conflict as to whether he had been "drug free" for the three and a half weeks prior to admission (as is shown by the Friary records) or whether he had actually ingested one of his wife's Darvocets during that time. That incident took place only a short number of days before he went in the Friary. At any rate, the time period is not particularly important in view of what I will say in just a minute.

Plaintiff was in the Friary for approximately two and a half or three weeks, so if he was terminated when he came back, he had not ingested drugs for approximately six weeks. The question is whether he was "no longer engaging in such use." The Defendant pointed to the testimony of the doctor at the Friary, who said that a person is in most serious danger of relapsing in the first three months after treatment and is not usually said to be in stable recovery for a year after treatment. The Plaintiff, if that definition is applied here, certainly would not have qualified under either approach.

 A strict reading of the statute would be in the Plaintiff's favor. Plaintiff was participating in a supervised rehabilitation program and in September of 1992 was no longer engaging in the use of illegal drugs in that he had not ingested them for a period of a few weeks. The question is whether this statute should be absolutely read to that degree or whether it should be read by interpreting it with the legislative history. The Court is of the opinion that the Legislative history indicates that Congress had in mind a drug free period of some considerable length. As shown by the evidence, a supervised rehabilitation program can continue long past inpatient treatment and a definition of "no

longer engaging in such use" can be read to mean that the person has been in recovery long enough to have become stable. The Court finds that Congress intended for this exception to mean that the recovery must be for some longer period than Plaintiff has presented here in this case, that this exception applies to a long term recovery program, and to a long term abstinence from drug use, not to an immediate one. The issue here is where one draws the line. The Court does not know where exactly to draw that line, but here finds that the Plaintiff is on the non-exception side of the line and therefore does not qualify under this exception, even if the adverse action occurred after he entered the treatment center. Accordingly, even considering the exception to the act, Plaintiff is not covered by the ADA.

Alternatively, if the Court is in error in finding that the Plaintiff is not covered by the ADA, then the Court looks to the merits of the case.

The Defendant argues, as a defense to the action that the Plaintiff was not able to perform an essential function of the employment position as set forth in Section 12111(8) of the Act. As stated earlier, the Plaintiff was employed as an adolescent marketing representative for the CDC. In essence, his job duties were to solicit patients. This was done by calling upon persons who normally refer adolescents to chemically dependent treatment centers. Generally speaking, those persons broadly are schools, churches, pastors, youth court judges, and others who have dealings with young people with drug problems. Mr. McDaniel was assigned those duties and performed them. In addition, even though it was not clearly a part of his duties in accordance with his job description, he was expected to perform initial interviews and assessments of prospective patients, primarily when he was out of the office and in the field. For example, if a youth court judge or a teacher at a school suggested that a young person needed treatment, then Mr. McDaniel would call upon that young person and his parents, would have face to face interviews, and would fill out initial assessment forms. The ultimate decision as to whether the prospective patient would be admitted was made by medical personnel, but the information collected by Mr. McDaniel was essential to that decision.

The Defendant argues that an essential function of the job was this interview function and that that function could not be properly performed, at least from the standpoint of the public relations reputation of the facility, by a person who had been through the recovery process but who had relapsed. Accordingly, it argues that compliance with the sobriety policy, which it says it had and had enforced in regard to Mr. McDaniel, was a valid business qualification, and that when it fired the Plaintiff for not complying with the policy, it fell under the exception to the definition of "qualified individual with a disability" which says that the person must be able to perform the essential functions of the position. 42 U.S.C. § 12111(8).

Plaintiff, on the other hand, argues that this qualification was not an essential function of the business and that this is illustrated by the fact that the Plaintiff, within three months of his termination, was able to again obtain employment in the Jackson drug treatment community. This first job was with DREAM, with whom he had previously been employed. Shortly after that he was employed by a competitor of the Defendant, Bradford Parkside Treatment Center, which had an outreach office in Jackson, Mississippi.

■ The Court notes that the Act specifically states in subpart (8) of Section 12111, "consideration shall be given to the employer's judgment as to what functions of the job are essential." Accordingly, the Court finds that it was not unreasonable or beyond the reach of the ADA for the Defendant to find that it was essential to the performance of the marketing job not to have a recently relapsed person holding that job.[4] Thus the

---

4. The Court notes in regard to this finding that a substantial percentage of the employees of the CDC are recovering chemically dependent persons. This is a very unusual type of business in that it employees a large number of the same type of people that it treats. Apparently there is considerable benefit in chemical treatment pro-

Court finds that even if the Plaintiff is covered, that the defense set forth by the Defendants is valid and that the Defendant is entitled to be discharged.

■ The Court notes as a final alternative, that if in fact the Court is wrong on all of these previous findings and that the Plaintiff is entitled to recover under the act, that the Plaintiff has shown only minimal damages. The Plaintiff was off work from October through December of 1992. He obtained employment at DREAM in January of 1993. If he were entitled to recover back pay he would then be entitled to recover three months of back pay at the annualized salary of $35,000 which was the amount he was making at the CDC at the time he was terminated. In addition, he would be entitled to the difference between $35,000 and his salary at DREAM for the first six months of 1993.

In June of 1993 he went to work for Bradford Parkside in a job with essentially the same marketing functions as he had at the CDC, and for a salary which was more than that he made at the CDC. Accordingly, for the time that he was there, he clearly was not entitled to any back pay.

■ The Defendant has argued correctly that the Plaintiff had a duty to mitigate his damages. Once the Plaintiff obtained the job with Bradford Parkside and then failed to keep that job, he failed to mitigate his damages. The Court accordingly finds that even if the Plaintiff were entitled to recover, he would not be entitled to recover back pay past June of 1993, at which time he had obtained a comparable job making more money.

The Plaintiff has argued that the Plaintiff was simply laid off in a reduction in force by Bradford Parkside and that this lay off was not his fault and that he had in fact mitigated his damages. On the other hand, his immediate supervisor, Hope Reagan, who was called by Plaintiff, testified that Mr. McDaniel had not produced as expected and that lack of production was why he was included in the layoff. The Court accepts this testimony and finds that the failure to maintain

his employment at Bradford Parkside after he obtained employment there was a failure to mitigate his damages.

Defendant further argued that Plaintiff was not entitled to return to his old position because he was not qualified to hold that position as evidenced by his inability to perform the same job at Bradford Parkside. The Court finds that the Defendant is correct in this contention. The Plaintiff himself testified that he was depressed and uninterested in doing the same type of work once he had lost his job at the CDC and gone to treatment.

■ On the other hand, the Friary records are clear that the Plaintiff admitted that a substantial part of his depression and his disillusionment with his job was not his termination. The Plaintiff told Friary personnel that he had been upset over "leading a double life", that is, trying to cope with his relapse at a time when he was trying to sell rehabilitation programs to prospective patients. The Court believes that this is why he had trouble performing at Bradford Parkside, not because he had been terminated from the CDC. Accordingly, the Plaintiff was not qualified after his treatment to return and properly perform his old job.

■ The Plaintiff has argued that the Plaintiff would be entitled to recover emotional damages and damages for injury to his credit reputation under the category of compensatory damages now allowed under the ADA by the recent amendments to the civil rights statutes. Obviously the Plaintiff is not entitled to recover damages if the Plaintiff was not entitled to prevail on the merits. The Court, however, will address two areas of damages: Emotional damages and damages to credit reputation. The Court finds that the Plaintiff failed to carry his burden of proof on either of those classifications of damages by a preponderance of the evidence. The Plaintiff clearly was upset and in a state of emotional depression, during the period of time surrounding these events. However, the Court finds that those problems of being

grams to use those who have recovered from the

same problems.

upset and emotionally depressed were caused by his relapse and not by his termination.

The Court now addresses the credit problems. In the first place, the Plaintiff failed to show that the credit problems he had were caused by the Defendant. The credit problems were triggered by his failure to have a source of income in the last quarter of 1992. However, the proof showed that all of the credit rating problems were joint problems shared by him and his wife. The proof further showed that in 1993 his wife went back to full-time employment and that he was essentially in full-time employment, and that their total earnings for 1993 were approximately $45 to $50,000 in contrast to 1992 when they had only made his salary approximately $35,000. These people simply did not manage their money as well as they should have. The Court suspects that one reason for this is that immediately prior to going into treatment at the Friary they closed escrow on a brand new house and ended up with a substantial house payment. At any rate, the Court finds that the Plaintiff has not proved that element of damages even if it is a proper element of damages and even if the Plaintiff should have prevailed on the merits.

Finally, the Court finds that the Plaintiff has failed to prove either of his state law claims of intentional infliction of emotional distress or negligent infliction of emotional distress. Intentional infliction under Mississippi law requires malice or intent. There is no proof of either in this case. Negligent infliction requires proof of a mental state which required the care of medical personnel. There is no proof in this case that Mr. McDaniel met that qualification. He certainly had psychiatric and psychological care at the Friary, but that was for his chemical dependency, not for his emotional distress brought about by termination of his job. Again, Plaintiff takes the position that he did not know he was terminated from the job until after his treatment at the Friary; therefore, that treatment could not have been for emotional distress caused by his termination.

The Court accordingly finds that the Plaintiff has failed as a matter of fact and as a matter of law to carry his burden and that the Defendant should be finally dismissed in this action at the cost of the Plaintiff. That is the ruling of the Court.

SO ORDERED.

Nunc pro tunc December 23, 1994.