**William R. SCOTT, Plaintiff,**

v.

**BEVERLY ENTERPRISES–KANSAS, INC., d/b/a Edwardsville Manor, Defendants.**

**Civil Action No. 96–2403–KHV.**

United States District Court,
D. Kansas.

June 24, 1997.

---

William F. Dunn, Wilkes & Dunn, Edwardsville, KS, for William R. Scott.

Renana B. Abrams, Jennifer P. Kyner, Stacey A. Campbell, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, Paul Venker, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, for Beverly Health and Rehabilitation Services, Inc.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff William R. Scott claims that Beverly Enterprises–Kansas, Inc., d/b/a Edwardsville Manor, fired him in June of 1995 on account of his drug addiction disability, in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.*, (the "ADA"). This matter comes before the Court on *Defendant Beverly Enterprises–Kansas, Inc., d/b/a Edwardsville Manor's Motion For Summary Judgment* (Doc. # 66) filed May 28, 1997. For reasons set forth more fully below, the Court finds that said motion should be sustained.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S.Ct.

at 2510. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. at 2512.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Investments, Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511–12. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D. Kan. Rule 56.1. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512. Ever mindful of these summary judg-

ment standards, we now turn to the merits of defendant's motion.

### Undisputed Facts

The following facts are undisputed or, where disputed, construed in the light most favorable to plaintiff: [1]

At all relevant times, plaintiff was a professional nurse. On September 12, 1994, for reasons which will be discussed below, the Kansas State Board of Nursing restricted plaintiff's nursing license so that he could not administer or have access to narcotic and mood-altering drugs or substances. It also prohibited him from having access to information regarding where such substances were kept. Specifically, the Board ordered as follows:

> Respondent will be granted a **limited** license to practice nursing as a registered professional nurse in the State of Kansas for two years. * * *
>
> A. LIMITATIONS. The following limitations are placed on the Respondent's ability to practice as a registered professional nurse in the State of Kansas. * * *
>
> 1. Respondent's limited license will enable him to seek employment as a registered professional nurse in any area of nursing for which he may be qualified and hired, *except* Respondent shall not administer any narcotics drugs or substances, nor shall Respondent administer any mood altering drugs/substances.
>
> 2. Respondent shall not have access to any narcotic medications or mood altering substances or any narcotic medications or mood altering substance storage areas.

Respondent is prohibited from carrying any keys or having any other access abilities or information to such storage areas. If medications Respondent may administer are stored or kept with narcotic medications or mood altering substances that Respondent may not administer, then another nurse shall be responsible for obtaining the medications Respondent may administer for him.

On June 7, 1995, plaintiff applied for a nursing job with Beverly Enterprises and learned that a charge nurse position was open at the Edwardsville Manor. On June 16, 1995, plaintiff interviewed for the position with Mickey Shurtz, Director of Nursing. During the interview, plaintiff did not tell Shurtz that he had a restricted license because, in his words, it was "none of their business." [2] According to plaintiff's affidavit, the restriction code was clearly printed on the face of his license, and he displayed it to both the initial recruiter at Beverly Enterprises and to Shurtz. *Affidavit,* ¶ 2 attached to *Memorandum In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 72) filed June 9, 1997 (*"Plaintiff's Affidavit"*). Plaintiff admits, however, that Shurtz did not look at the license at the time of the interview, *Deposition of William H. Scott* (April 17, 1997) at 37 and 70, and the record is unclear whether the recruiter looked at it or merely copied it. *Id.* at 32. The record is also unclear—since neither party has favored the Court with a copy of plaintiff's license—whether a restriction code was "clearly printed" on the face of the license.[3]

---

1. Defendant has magnified the record by filing thousands of pages of exhibits, the vast majority of which have no arguable relevance to its motion and are never cited in support of a single assertion of material fact. Pursuant to D. Kan. Rule 56.1, which requires the memorandum in support of a summary judgment motion to begin with a concise statement, of undisputed material facts, the Court has limited its factual inquiry to the matters which the parties have expressly put in issue.

2. At his deposition, plaintiff testified as follows:
   Q: . . . You asked—you say you asked Mickey Shurtz in this interview about how heavy the load of narcotics was by way of medications at the home. That was before you were hired, correct?

   A: Yes.
   Q: Was there a reason you didn't mention at that point your nursing license restriction that you couldn't pass narcotics or even know where they were?
   A: There certainly was a reason.
   Q: And that was?
   A: Wasn't any of their business.
   *Deposition of William H. Scott* (May 14, 1997) at 208.

3. Plaintiff's deposition testimony was as follows:
   Q: . . . I missed where you were pointing out to me on that card that it shows there's a restriction of some kind.
   A: It shows, uh-huh.
   Q: Could you show me that again? I apologize.

That same day, Shurtz hired plaintiff for the Charge Nurse position. According to written job descriptions for that position, the "essential job functions" of a charge nurse included (1) ensuring accurate documentation of all medical records and reporting forms; (2) assuring that all narcotics are accounted for properly; (3) preparing and administering medications as ordered by the physician; and (4) in accordance with nursing standards and facility policies, signing, dating and performing all charting and record-keeping with regard to drug administration. Although these duties were facially incompatible with plaintiff's license restrictions, plaintiff claims that he was "ready and able" to perform the duties of Charge Nurse "as those duties were set out and explained to me by Mickey Shurtz." *Plaintiff's Affidavit,* ¶ 4. Plaintiff explains, as follows:

Q: I did ask her very specifically about medications. She described that the medications were passed by an LPN. I asked her specifically about narcotics. She said, "This is not a—this is not a health unit; this is a psychiatric unit. We have very, very little narcotics, and what we have is on what we call the sick wing, and you'll probably never even work over there." She said—and this is a direct quote. She said, "I'm not hiring you to pass medications. I'm hiring you to get back there and get those people off of their butts." That is verbatim direct quote. * * *

Q: Okay. So you asked her about the medications then. Why did you do that?

A: Well, I wanted it clear in my mind that I was not going to have a problem if she did offer me a position when I then had to tell her that I would need some accommodation. If it was the kind of a job that she expected me daily to be able to

A: Yes, certainly. Where it says "Status Code, L." * * * I don't know what that stands for myself but I'm just guessing that maybe it means that it's in legal or something, you know.
Q: But you're saying that even you don't know?
A: No, the average nurse, you know, on the floor doesn't know, but the people that are responsible for checking these things out do know.
*Deposition of William H. Scott* (April 17, 1997) at 39–40.

pass narcotic medications, she obviously was not going to be able to accommodate me. But I satisfied myself from the questions I asked and the answers she gave me that she didn't care whether I ever passed narcotic medication.

*Deposition of William H. Scott* (April 17, 1997) at 35–36.

On Thursday, June 19, 1995, plaintiff appeared for his first day of work, for job orientation. The following day, plaintiff signed two separate acknowledgments with respect to his written job descriptions: [4]

I understand this job description and its requirements, and that I am expected to complete all duties as assigned. * * *

I have noted below any accommodations that are required to enable me to perform these duties. I have also listed below any job responsibilities or functions which I am unable to perform, with or without accommodation.

-----------------------------------------------------------
-----------------------------------------------------------

[signed] W.H. Scott RN     [dated] 6/20/95

Plaintiff did not note any necessary accommodations or any job responsibilities or functions which he was unable to perform, with or without accommodation.

That very day, however, plaintiff "mentioned" to the person who was conducting his job orientation that because he had license restrictions, he could not administer narcotic drugs or mood-altering drugs. When Shurtz learned that plaintiff had a restricted license, she contacted the Kansas State Board of Nursing to verify the fact and scope of the restriction. She then learned that plaintiff was prohibited from having keys or access to

**4.** Plaintiff attaches the first two pages of one job description [Scott Deposition Exhibit 6], minus the signature page, to his *Memorandum In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 72) filed June 9, 1997. The Court does not believe that this oversight was unintentional. Nor does it believe that plaintiff omitted all reference to the other written job description [Scott Deposition Exhibit 7]. Both descriptions are part of Exhibit 17 to the summary judgment record.

narcotic drugs or substances or mood-altering drugs and substances, prohibited from administering such drugs, and prohibited from having information about their whereabouts.

On June 21, 1995, Shurtz told plaintiff that his license restrictions made it impossible for him to carry out the essential job functions of the position for which he had been hired. She also fired him.

On or about July 13, 1995, plaintiff filed an EEOC charge which alleged that defendant had discriminated against him on account of his disability, i.e., his prior drug addiction. The circumstances surrounding that addiction are these:

On April 4, 1990, plaintiff applied for and obtained employment at St. John's Hospital in Leavenworth, Kansas. He worked for two weeks, until April 17, 1990, when he left due to "health reasons."

Three months later, on July 16, 1990, plaintiff accepted a job at Trinity Lutheran Hospital in Kansas City, Missouri, as a full-time employee after working there for several months through an agency. After three and one-half months on the job, plaintiff was confronted about alcohol use on the job and charting discrepancies for prescription medications (narcotics). Plaintiff denied any mischarting but because he twice refused to submit to a drug screen, Trinity Lutheran fired him on November 1, 1990. It also filed a complaint against his nursing license with the Missouri Board of Nursing.

Later that month, in November of 1990, St. John's Hospital rehired plaintiff. The following month, in December of 1990, plaintiff began a three-month drug abuse outpatient program that concluded in February of 1991. Plaintiff relapsed, however, before he finished the program.

On April 30, 1991, plaintiff's Missouri nursing license expired. At its meeting in July of 1991, the Missouri Board of Nursing reviewed an investigative report which had been prepared in response to the complaint by Trinity Lutheran. The Board decided to flag plaintiff's file and review the situation if he decided to renew his license. The Board advised plaintiff of its decision in a letter dated August 21, 1991.

In February 1992, plaintiff entered into an agreement with the Kansas Nurses Assistance Program ("KNAP"), by which plaintiff agreed to provide information to KNAP in order to show that he was in treatment and true recovery for drug addiction. At about this same time, he took a leave of absence from his job at St. John's Hospital. Plaintiff then underwent a 30–day treatment program for addiction at Valley Hope in Atchison, Kansas.

On March 20, 1992, plaintiff returned to his position at St. John's Hospital, on the condition that he not give narcotics or have access to areas where narcotics were stored. In April of 1992, plaintiff received a renewal of his Kansas nursing license. He listed St. John's Hospital as his current employer and indicated on his application that he was not licensed in any other states. He also denied that any disciplinary action had been taken against his Missouri license.

On June 28, 1992, St. Joseph's Hospital found plaintiff sleeping on the job. Plaintiff submitted to a drug screen, which tested positive for drugs. The hospital therefore fired him.

Six months later, in December of 1992, plaintiff obtained a nursing position in the kidney dialysis department at Kansas University Medical Center. Plaintiff worked there for six months, until June of 1993, when he resigned over a dispute regarding a back injury which he claimed was work-related. The following month, in August of 1993, plaintiff obtained a nursing position with American Home Health Care. He worked there until American Home Health Care fired him for "paperwork being turned in half-filled out or not making any sense and those kinds of reasons." This termination was "secondary to narcotics problems."

On October 6, 1993, the Missouri Board of Nursing, apparently in response to plaintiff's inquiry, advised him that it would renew his license if he agreed to a period of discipline. As a result, in November of 1993, plaintiff entered into an agreement with the Missouri State Board of Nursing, in order to renew

his Missouri license. Terms of the agreement included periodic submission of employer evaluations, chemical dependency treatment by a licensed professional, avoidance of alcohol and other controlled substances, a mental health evaluation and attendance at a support group or group therapy.

Three months later, on March 25, 1994, the Kansas State Board of Nursing revoked plaintiff's Kansas nursing license under K.S.A. § 65–1120. Plaintiff did not appeal. The following week, on March 30, 1994, physicians at the Kansas University Medical Center diagnosed plaintiff as addicted to narcotics and a mood-altering drug known as Clonazepam (Klonopin). Physicians recommended that plaintiff be transferred to Shawnee Mission Medical Center for drug rehabilitation. The next day, plaintiff admitted to his medical center doctors that he was addicted to Nubain, Demerol and Darvocet. Plaintiff's primary physician, Dr. Peter Cristiano, concurred with the medical center doctors and referred plaintiff to Shawnee Mission Medical Center for inpatient drug rehabilitation because of addiction to prescription medications. Plaintiff, however, failed to keep his appointment with the Substance Abuse Center at Shawnee Mission Medical Center in early April. He advised Dr. Cristiano that he did not want to go to Shawnee Mission Medical Center for drug rehabilitation.

On May 25, 1994, plaintiff applied for reinstatement of his Kansas nursing license. He did not disclose his employment at Trinity Lutheran and American Home Health, however, and he claimed that he had left St. John's Hospital in June of 1992 due to illness. On September 12, 1994, pursuant to K.S.A. § 65–1120, the Kansas State Board of Nursing imposed the license restrictions which are mentioned above, prohibiting plaintiff from administering or having access to narcotic and mood-altering drugs or substances. The Board also ordered plaintiff, as a condition of maintaining his restricted license, to enroll and participate in the Kansas Nurses Assistance Program. Plaintiff did not appeal this decision. Indeed, on October 12, 1994, plaintiff entered into an agreement with KNAP, whereby he agreed as follows:

... if I am found to be chemically dependent, co-dependent, or to have an illness or condition that involves the potential for the mishandling of drugs, including prescribed medications and alcohol, I will: ...

-not use any mood altering drugs of addiction, including alcohol and prescription medications unless approved by my therapist and the program staff. I understand that I will have to make copies of such prescriptions available and may have to consult with a physician knowledgeable in the treatments of addictions....

-unless exempted by approval of the Kansas State Board of Nursing, inform my employer that I am participating in this program....

-not administer or otherwise have access to controlled substances until approved by the program and by the Board of Nursing if subject to Board order.

The following month, on October 10, 1994, plaintiff petitioned to renew his Missouri nursing license. Less than a month later, however, on November 5, 1994, Dr. Cristiano referred plaintiff to Valley Hope—Mission for treatment for drug abuse and depression. On November 10, 1994, at the request of KNAP after plaintiff had been observed using slurred speech in a telephone call, plaintiff submitted to a urine drug screen. He tested positive for Demerol and Darvocet. Two weeks later, on November 23, 1994, plaintiff's counselor at Valley Hope—Mission signed Patient Progress Notes which stated as follows:

Client reports being alcohol and drug free, but shows physical signs of impairment, slurred speech, disorganization, abrasive, evasive, reports going to AA at one session, then says differently at another, has evaded giving us a list of present medications. It would seem that this man be seen for further psychiatric testing and evaluation, possibly in an inpatient setting, to evaluate him completely.

Two days later, another counselor at Valley Hope Mission signed Patient Progress Notes which stated as follows:

I asked Bill if he wanted his wife in room to go over evaluation and he reported that he did. I began going over psychologist's report. When I shared there appeared to be some psychiatric problems and that we thought that it would be in his best interests if he went inpatient on a psychiatric unit to in part assess his situation, i.e., medical/emotional, they both became very angry, particularly his wife. They are in serious financial situation and both stated this was not possible.

About ten days later, on December 6, 1994, plaintiff saw David Ruhlen, a counselor at Northeast Kansas Mental Health Center. Ruhlen observed that plaintiff slurred his speech slightly. He also noted that plaintiff told him that he had lied in therapy, but had been able to convince everyone except his wife that he was clean and sober. According to Ruhlen, plaintiff told him that he went outpatient after he got fired from Trinity Lutheran and was relapsing before he finished the program. Also according to Ruhlen, plaintiff told him that he had been confronted at St. John's and that it had contacted KNAP. Plaintiff told Ruhlen that he then went to Valley Hope, but was using drugs from time to time. His longest period of abstinence was four to five months.

On January 23, 1995, plaintiff applied for Social Security disability benefits, claiming that he was unable to work due to back injury or fibromyalgia as well as drug addiction. In a letter dated February 7, 1995, Ruhlen told the Social Security Administration that "Scott ... has a tenuous grasp, if any, of recovery principles." Ruhlen noted that because plaintiff "often used his position as a nurse to gain access to drugs, and has been fired from several nursing positions because of this, I don't think that he is capable of performing as nurse now and likely never will be again." Ruhlen also stated that plaintiff had indicated during his interview that he lied about periods of sobriety that were documented elsewhere.

On March 17, 1995, the Kansas State Board of Nursing issued a Petition to Show Cause why plaintiff's license should not be revoked for failure to comply with prior reporting requirements. On April 17, 1995, the Board held a hearing on the order to show cause. It declined to revoke plaintiff's license, but ordered him to (1) make sure that MMPI results were delivered from Valley Hope to the Northeast Kansas Mental Health and Guidance Center and KNAP, so that recommendations could be developed and followed; (2) get involved and participate fully in the KNAP program; (3) provide KNAP all medical information so that medical issues could be dealt with in conjunction with substance abuse problems; and (4) provide KNAP releases of information regarding all medical and substance abuse treatment.

At about this time, on April 30, 1995, plaintiff allowed his Missouri license to lapse.

In April, May and June of 1995, plaintiff filled prescriptions for Nubain,[5] Klonopin,[6] Nortriptyline, Prozac and Paxil, as well as other drugs. On June 7, 1995, plaintiff completed his job application for Edwardsville Manor. On June 16, 1995, he accepted the Charge Nurse position. Five days later, on June 21, 1995, he got fired. Nine days after that, on June 30, 1995, the State of Kansas filed a second show cause motion, asserting that plaintiff had failed to comply with earlier reporting requirements. On July 14, 1995, and again on August 9, 1995, the Kansas State Board of Nursing conducted hearings on plaintiff's license. Plaintiff appeared and testified, as did his wife.

On August 29, 1995, after a hearing pursuant to K.S.A. § 65–1120, the Kansas State Board of Nursing revoked plaintiff's license because of concerns about his substance and chemical dependence disease. Officials at KNAP testified they had not been provided evidence of attendance at meetings of Alcoholics Anonymous or Narcotics Anonymous. The Board stated that if plaintiff signed a

---

5. Nubain is a synthetic narcotic. Nubain and other narcotics can impair judgment, impact response time and impair one's ability to do physical tasks such as driving. Narcotics impair the ability of health care professionals to respond to patient emergencies and patient needs.

6. Klonopin, a central nervous system depressant and mood-altering drug, is in the same chemical family (benzodiazepine) as Valium. Klonopin can impair judgment and delay response time.

new monitoring agreement with KNAP and demonstrated that he had complied with it for 30 days, he could apply for reinstatement.

Plaintiff did not appeal the Kansas decision, but on October 10, 1995, he filed a petition to renew his nursing license in Missouri. In doing so, he did not disclose the fact that Kansas had revoked his license. By late October of 1995, plaintiff obtained a renewal. At about that time, he applied for a nursing job with Favorite Nurses. On November 6, 1995, Favorite Nurses placed plaintiff in a position at St. Luke's Hospital in Kansas City, Missouri. Four days later, on November 10, 1995, Lynn Vaughn, an RN at St. Luke's Hospital, reported plaintiff to the Missouri Board of Nursing for "suspected misappropriation of narcotics" on the shift for November 6–7, 1995 (plaintiff's first or second day on the job).

Later that month, on November 29, 1995, plaintiff admitted to Rhonda Weimer, counselor at Northeast Kansas Mental Health Center, that he had suffered a relapse. On December 26, 1995, during an interview with an investigator from the Missouri Board of Nursing, plaintiff stated that "these questions were all kind of a moot point" because he was 58 years old, he did not have the stamina or desire he had had five or six years earlier, he could not keep up with the pace or the work load, and he had therefore decided to relinquish his nursing licenses. On April 17, 1996, the Missouri State Board of Nursing advised plaintiff of two complaints against his license and told him that the Board had flagged his license and would review the matter if plaintiff requested license renewal. In April 1996, however, plaintiff's Missouri license lapsed.

On February 14, 1997, plaintiff's primary physician, Dr. Gerald Oliver, confronted plaintiff regarding "excessive use of narcotics, manipulative behavior to obtain them, as well as apparent dishonesty in obtaining them and requesting them." In early February 1997, a Dr. Eubanks (at Shawnee Mission Medical Center Pain Clinic) sent plaintiff to the Menorah Hospital Psychiatric Unit. Plaintiff initially believed that the admission was for pain control but upon arrival, he suspected that he was being admitted for inpatient drug treatment and he refused to be admitted. As of May 14, 1997, plaintiff admits to current use of Klonopin, Prozac, Prilosec, Depakote and Pravachol.

## Analysis

The ADA prohibits an employer from discriminating against a "qualified individual with a disability" because of that individual's disability. 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, a plaintiff must demonstrate: (1) that he is a disabled person within the meaning of the ADA; (2) that he is otherwise qualified, that is, that he is able to perform the essential functions of the job with or without reasonable accommodation (which he must describe); and (3) that the employer terminated his employment under circumstances which give rise to an inference that the termination was based on disability. *See MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1443 (10th Cir.1996); *White v. York Int'l Corp.*, 45 F.3d 357, 361 n. 6 (10th Cir. 1995). An individual is not otherwise qualified under the second prong of this test, however, if he "is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a).[7] While expressly excluding current drug users from statutory protection, however, the statute provides a "safe harbor" for recovering addicts, as follows:

> Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who—
>
> (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;

---

7. The statute, 42 U.S.C. § 12114(a), provides in relevant part as follows:

   For purposes of this subchapter, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

(2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or

(3) is erroneously regarded as engaging in such use, but is not engaging in such use;

except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

42 U.S.C. § 12114(b).

■ The parties do not dispute that drug addiction is a disability. Defendant contends that plaintiff was not "otherwise qualified" under the ADA, however, because he was "currently engaging" in illegal drug use at the time of his discharge. Plaintiff argues, relying on the plain language of "currently engaging in the illegal use of drugs," that he was not a "current" user when defendant fired him. In support of that factual proposition, plaintiff swears that he "never abused or illegally used any drug in the month of June, 1995," and that any drug which he did ingest in that 30–day period was "pursuant to prescription from a licensed health care provider."[8]

The dispute therefore centers on the scope of the phrase "currently engaging in the illegal use of drugs." *See* 42 U.S.C. § 12114(a). Plaintiff argues for a narrow definition, contending essentially that the statutory language means "during the same month" or (because plaintiff was fired on June 21, 1995 and he swears that he did not abuse drugs *during the month of June*) "within ten days" of the date of termination.

■ The Tenth Circuit apparently has not construed the phrase "currently engaging in the illegal use of drugs." When Congress does not expressly define a statutory term or phrase, however, a court should "normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993). The Court concurs with *Shafer v. Preston Memorial Hospital Corp.,* 107 F.3d 274, 278 (4th Cir. 1997) that the term "currently," in this context, means "a periodic or ongoing activity in which a person engages (even if doing something else at the precise moment) that has not yet permanently ended." In addressing this issue, the Fourth Circuit made the following points which are germane to the issue before us:

We agree that in some instances the word "currently" modifies actions an individual is engaged in at the present moment. *See Webster's II New Riverside University Dictionary* 337 (1988) (defining "current" as "belonging to the present time" or "now in progress"); *Webster's Third New International Dictionary* 557 (1986) (defining "current" as "in operation at the time actually elapsing," and "currently" as "at present"). [Plaintiff] contends that this narrow definition excludes from statutory protection only those persons engaging in the illegal use of drugs "at present" or during "the time actually passing." We disagree. "The word 'current', when used as an adjective, has many meanings, and definition depends largely on [the] word which it modifies, or subject-matter with which it associated." *Black's Law Dictionary* 345 (1981). In the ADA and the Rehabilitation Act, "currently" modifies the phrase "engaging in the illegal use of drugs." Contrary to [plaintiff's] assertion, the ordinary or natural meaning of the phrase "currently using drugs" does not require that a drug user have a heroin syringe in his arm or a marijuana bong to his mouth at the exact moment contemplated. Instead, in this context, the plain meaning of "currently" is broader. Here, "currently" means a periodic or ongoing activity in which a person engages (even if doing something else at the precise moment) that has not

---

8. See *Affidavit,* ¶ 3, attached to *Memorandum In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 72) filed June 9, 1997. In evaluating plaintiff's position, it is important to recall that plaintiff is not charged with using illegal drugs, so much as he is charged with abusing drugs which may be lawfully prescribed. Moreover, on February 14, 1997, plaintiff's primary physician charged plaintiff with "excessive use of narcotics, manipulative behavior to obtain them, as well as apparent dishonesty in obtaining them and requesting them."

yet permanently ended. For example, "Dr. Hawking is *currently* engaged in scientific research," and "Star Wars is *currently* playing at a local theater." *See Webster's Third New International Dictionary* 557 (1986) (providing examples of the broad definition of "currently"). Accordingly, under the plain meaning of the statutes, an employee illegally using drugs in a periodic fashion during the weeks and months prior to discharge is "currently engaging in the illegal use of drugs."

*Id.* at 277–78. *See also Collings v. Longview Fibre Co.,* 63 F.3d 828, 833 (9th Cir.1995) (reviewing legislative history and concluding that employees who used drugs during weeks and months prior to discharge were current users under ADA, even though they were drug-free on date of termination), *cert. denied,* —— U.S. ——, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996); *McDaniel v. Mississippi Baptist Med. Ctr.,* 877 F.Supp. 321, 327 (S.D.Miss.1994) (stating that "the Legislative history indicates that Congress had in mind a drug free period of some considerable length"), *aff'd,* 74 F.3d 1238 (5th Cir.1995); *Wormley v. Arkla, Inc.,* 871 F.Supp. 1079, 1080–84 (E.D.Ark.1994) (reviewing legislative history and holding that plaintiff who was not illegally using drugs on the day of his termination, which was also the day of his release from the rehabilitation program, was a current user under the ADA because his "drug use was sufficiently recent to justify an employer's reasonable belief that it was an ongoing problem rather than a problem that was in the past").

In this case, the Court finds as a matter of law that plaintiff was "currently engaging in the illegal use of drugs" at the time of his termination on June 21, 1995. The undisputed evidence is that plaintiff periodically abused drugs during the weeks, months and years before and after his termination. Indeed plaintiff only denies illegal use of drugs during one 30–day period, that being the month of June, 1995. On this record, drug abuse was an ongoing activity that had not permanently ended as of June 21, 1995, and a reasonable jury could not conclude other than that plaintiff was "currently engaging in the illegal use of drugs" at that time.

■ This conclusion does not end the inquiry, however, because under 42 U.S.C. § 12114(a), the term "qualified individual with a disability" does not include an employee who is currently engaging in the illegal use of drugs, *when the covered entity acts on the basis of such use.* In this case, defendant claims that it fired plaintiff because of unacceptable restrictions on his nursing license, and not because of illegal drug use. We therefore address the second prong of plaintiff's case, that is, whether plaintiff has demonstrated that he is otherwise able to perform the essential functions of the job, with or without reasonable accommodation.

Defendant maintained written job descriptions for plaintiff's position of Charge Nurse.[9] They required that the Charge Nurse administer narcotics and assure that narcotics were properly accounted for. While plaintiff maintains that the job descriptions contain "no duties that would be affected by Plaintiff's license restrictions," his assertion is refuted by the face of the job descriptions themselves. Moreover, while plaintiff swears that as of June, 1995, he was "ready and able to perform the duties of 'charge nurse' at Edwardsville Manor, as those duties were set out and explained to [him] by Mickey Shurtz," see *Plaintiff's Affidavit,* ¶ 4, attached to *Memorandum In Opposition To Defendant's Motion For Summary Judgment* (Doc. # 72) filed June 9, 1997, plaintiff does not state what Shurtz told him—other than that he would not be required to pass narcotic medication. He does not claim that Shurtz exonerated him from any duty to assure that narcotics were properly accounted for.

In order to proceed with a claim under the ADA, plaintiff must show that he is a "qualified individual with a disability" as defined in 42 U.S.C. § 12111(8). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or de-

---

9. Plaintiff does not contend that the job descriptions incorrectly summarize the duties of his position, and he acknowledged that he had reviewed and understood what they required.

sires." *Id.* At trial, plaintiff would have the burden of proving that with or without reasonable accommodation, he could perform the essential functions of the Charge Nurse position. To avert summary judgment, he was obligated to come forward with specific facts showing that a genuine issue remains for trial on the question (1) whether an essential function of the charge nurse was to assure that narcotics were properly accounted for; (2) whether plaintiff could assure that narcotics were properly accounted for, given his license restriction; or (3) if not, whether *with reasonable accommodation* plaintiff could assure that narcotics were properly accounted for.

Notwithstanding his burden of proof, plaintiff does not address these critical issues. Plaintiff makes no claim that he could properly account for narcotics, in view of his license restriction. Moreover, plaintiff bears the initial burden to make a facial showing that accommodation is possible. *White,* 45 F.3d at 361 (citing *Mason v. Frank,* 32 F.3d 315, 318 (8th Cir.1994); *Barth v. Gelb,* 2 F.3d 1180, 1187 (D.C.Cir. 1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994); *Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991)).[10] Plaintiff has not met this burden and defendant is therefore entitled to summary judgment. On this record, the Court has little hesitation in concluding as a matter of law that plaintiff is not a "qualified individual with a disability," as that term is defined in the ADA.

Given its holding that plaintiff does not qualify for protection under the ADA, the Court has no occasion to pass upon defendant's remaining arguments.

IT IS THEREFORE ORDERED that *Defendant Beverly Enterprises–Kansas, Inc., d/b/a Edwardsville Manor's Motion For* *Summary Judgment* (Doc. # 66) filed May 28, 1997, be and hereby is sustained.

---

10. The burden of production then shifts to the employer to present evidence of its inability to accommodate. *White,* 45 F.3d at 361. If the employer presents such evidence, the plaintiff may not simply rest on his pleadings. He has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. *Id.* at 361–62 (plaintiff's subjective opinion alone was insufficient evidence that he could perform various other jobs where employer produced evidence that the jobs did not meet his restrictions or that there were no vacancies).