Revised May 28, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 98-50063

———————————

TOM ZENOR,

Plaintiff-Appellant,

versus

EL PASO HEALTHCARE SYSTEM, LIMITED,
doing business as Columbia Medical
Center-East; COLUMBIA MEDICAL CENTER-EAST,

Defendants-Appellees.

———————————

Appeal from the United States District Court for the
Western District of Texas

———————————

May 24, 1999

Before GARWOOD, BARKSDALE, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Tom Zenor (Zenor) appeals the district court's grant of judgment as a matter of law in favor of his former employer, Vista Hills Medical Center, now defendant-appellee El Paso Healthcare Ltd., d/b/a/ Columbia Medical Center-East (Columbia). We affirm.

## Facts and Proceedings Below

In 1991, Columbia hired Zenor to work as a pharmacist in the

pharmacy at its Columbia Medical Center-East hospital.  When Zenor began his employment, he received an employment manual expressing the at-will nature of his employment and disclaiming any contractual obligations between the employer and employee. Zenor also received a copy of Vista Hill's then-existing drug and alcohol policy.  In 1993, Zenor received a copy of Columbia's Drug-Free/Alcohol-Free Workplace Policy (the Policy), which was in effect at all times relevant to this case.

In 1993, Zenor became addicted to cocaine.  Between 1993 and 1995, Zenor injected himself with cocaine as many as four to five times a week.  He also smoked marijuana on three or four occasions and more frequently used tranquilizers to offset the cocaine's effects.  Despite his drug use, Zenor remained a generally adequate employee and usually received favorable employment evaluations.  However, his evaluation for the year ended July 8, 1994, discussed with Zenor in October 1994, was not favorable, his performance was rated "below average," and he was placed in a probationary status for two months with the admonishment that discharge was possible if insufficient improvement were noted.  Zenor successfully completed the probationary status.  The record does not show any subsequent annual evaluation.  Zenor testified he never used drugs at work, nor came to work under the influence of drugs.  Columbia was unaware of Zenor's addiction until August 15, 1995.

Zenor had been working the night shift at the pharmacy.  When Zenor left work on August 15, 1995, at approximately 8:30 a.m., he

2

injected himself with cocaine. As Zenor prepared to return to work that night, he became dizzy and had difficulty walking. Suspecting that he was still impaired from the morning's cocaine injection, Zenor called the pharmacy director, Joe Quintana (Quintana), and stated that he could not report to work because he was under the influence of cocaine. During the conversation, Quintana asked whether Zenor would take advantage of Columbia's Employee Assistance Program, "ACCESS." Zenor replied that he would. Quintana then stated that he was on vacation, and instructed Zenor to contact Quintana's supervisor, Paschall Ike (Ike).

Zenor spoke to Ike, who was also on vacation and told Zenor to call his (Zenor's) own doctor. Zenor then called his personal physician, who arranged for Zenor to receive emergency treatment that evening. Zenor stayed overnight at R.E. Thomason General Hospital. The next morning, Zenor was transferred to the El Paso Alcohol and Drug Abuse Service Detox Center, where he remained hospitalized for nine days.

On August 23, while still at the Detox Center, Zenor became concerned about losing his job. Zenor and one of his Detox Center counselors, Pete McMillian (McMillian), contacted Yolanda Mendoza (Mendoza), Columbia's Human Resources Director. This was the first time Zenor had contacted Columbia since his conversation with Ike eight days earlier. Nobody at Columbia knew where Zenor had been since the night of August 15.

Zenor told Mendoza that he wished to enter a rehabilitation

3

program and asked her whether his job would be secure until he returned. Although the evidence is disputed, there is evidence that Mendoza assured Zenor that his job would be secure until he completed the program. Mendoza then told McMillan that Zenor was eligible for a twelve-week leave of absence under the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et. seq.* Later that afternoon, McMillian retrieved from Mendoza the paperwork necessary for Zenor to take FMLA leave. Zenor completed the paperwork. The next day, August 24, Zenor checked into an independent residential rehabilitation facility, Landmark Adult Intensive Residential Services Center (Landmark). Landmark was not owned or operated by Columbia and was not part of its ACCESS program.

After consulting with Columbia's lawyers, Mendoza and Quintana decided to terminate Zenor's employment. On September 20, 1995, Mendoza, Quintana, and ACCESS director Joe Provencio had a meeting with Zenor, his Landmark counselor, and Landmark's Director of Adult Treatment Services Dorrance Guy (Guy). Zenor was told that he would remain an employee of Columbia until his medical leave expired, and then he would be terminated.

Zenor protested that Columbia could not fire him because the Policy stated that employees who completed rehabilitation would be returned to work. Zenor also argued that he had been told if he "self-reported" his addiction he would not be fired. Mendoza explained that Columbia was concerned because pharmaceutical

4

cocaine would be readily available to Zenor in the pharmacy, and therefore Columbia would not allow Zenor to return to work.

Zenor offered to transfer to a day shift where he could be monitored, or to a satellite pharmacy where pharmaceutical cocaine would not be available. Columbia rejected these suggestions. The next day Guy wrote a letter to Provencio calling Columbia's action unfair, and contrary to Guy's interpretation of the Policy. Columbia did not respond to the letter.

Zenor completed the residential portion of his treatment program and was released from Landmark on October 9, 1995. On October 18, Zenor met with Mendoza and again asked to keep his job. Mendoza told Zenor that his termination stood. Zenor then requested that Mendoza write an official letter regarding his termination, in order to assist Zenor in continuing his medical benefits.

Zenor later sued Columbia, alleging that he was fired in violation of the Americans with Disabilities Act (ADA) and the Texas Commission on Human Rights Act (TCHRA). Zenor also alleged claims of fraud, breach of contract, promissory estoppel, and intentional infliction of emotional distress.

Following discovery, Columbia moved for summary judgment. The district court granted summary judgment for Columbia on Zenor's intentional infliction of emotional distress claim, but denied summary judgment on the other claims. The case proceeded to trial on the remaining claims. At the conclusion of Zenor's case-in-

chief, Columbia moved for judgment as a matter of law. The district court granted Columbia judgment as a matter of law on Zenor's disability discrimination, fraud, and breach of contract claims. Only Zenor's promissory estoppel claim was submitted to the jury.

The jury found for Zenor on the promissory estoppel claim, and awarded him substantial damages, including damages for past lost earnings, future lost earnings, and mental anguish. Columbia renewed its motion for judgment as a matter of law. The district court granted Columbia's renewed motion, holding that there was insufficient evidence to support two elements of the promissory estoppel claim: the existence of any promise altering the at-will relationship or foreseeable and reasonable reliance by Zenor. Zenor appeals and in this Court challenges only the dismissal of his ADA, breach of contract, and promissory estoppel claims.[1]

**Discussion**

I. The ADA

The ADA, 42 U.S.C. § 12101 *et. seq.*, prohibits an employer from discriminating against a "qualified individual with a

---

[1] Zenor does not raise his TCHRA claim on appeal. The TCHRA claim is analogous to the ADA claim, and generally would be treated similarly. *See Talk v. Delta Air Lines, Inc.*, 165 F.3d 1021 (5th Cir. 1999). We are pointed to nothing under the Texas law which would in this appeal authorize a different disposition of the TCHRA claim than of the ADA claim. Hence we do not separately address the TCHRA claim.

disability" on the basis of that disability. 42 U.S.C. § 12112(a). To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; (3) that he was subject to an adverse employment decision on account of his disability. *Robertson v. Neuromedical Center*, 161 F.3d 292, 294 (5th Cir. 1998) *(per curiam)*. *See also Burch v. Coca-Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 36 (5th Cir. 1996).

At the close of Zenor's case-in-chief, the district court found insufficient evidence to support the ADA claim and granted Columbia's motion for judgment as a matter of law. On appeal, the parties raise three separate questions with respect to the ADA claim: (1) whether Zenor was disqualified from the ADA's protection because he was a "current user" of illegal drugs at the relevant time, (2)whether Zenor was an otherwise qualified individual, and (3)whether Zenor established that he suffered from a disability.

This Court reviews a judgment as a matter of law *de novo. See Burch*, 119 F.3d at 313. Judgment as a matter of law is proper only where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). This Court reviews the record in the light most favorable to the party opposing the motion. *Burch*, 119 F.3d at

7

313.

The district court correctly granted judgment in favor of Columbia. First, Zenor is excluded from the definition of "qualified individual" under the ADA because he was a current user of illegal drugs. Similarly, due to Zenor's cocaine use, he was not otherwise qualified for the job of a pharmacist. Alternatively, regardless of whether Zenor was a current user of illegal drugs, Zenor failed to prove that he was disabled within the meaning of the statute.

The first issue is whether Zenor was "currently engaging in the illegal use of drugs" at the time the adverse employment action was taken. 42 U.S.C. § 12114 specifically exempts current illegal drug users from the definition of qualified individuals. *See* 42 U.S.C. § 12114(a) ("For purposes of this title, the term 'qualified individual with a disability' shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use."). In other words, federal law does not proscribe an employer's firing someone who currently uses illegal drugs, regardless of whether or not that drug use could otherwise be considered a disability. The issue in this case, therefore, is whether Zenor was a "current" drug user within the meaning of the statute.

As a threshold matter, this Court must determine the proper time at which to evaluate whether Zenor was "currently engaging in

8

the illegal use of drugs." Zenor urges this Court to look to the date his employment status officially ended: November 24, 1995. The Second Circuit adopted this approach in *Teahan v. Metro-North Commuter R.R. Co.,* 951 F.2d 511 (2d Cir. 1991). Teahan was an alcoholic who had missed an extensive amount of work due to his alcoholism. On December 28, 1987, Metro-North wrote a letter informing Teahan that his employment was terminated. That same day, before receiving the termination letter, Teahan voluntarily entered a rehabilitation program. *Id.* While Teahan was in the rehabilitation program, Metro-North initiated procedures to fire Teahan pursuant to its collective bargaining agreement with the International Brotherhood of Electrical Workers (IBEW). However, the disciplinary procedures were not complete on January 28, 1988, when Teahan completed the rehabilitation program. Pursuant to its agreement with IBEW, therefore, Metro-North permitted Teahan to return to work temporarily. Metro-North finally terminated Teahan on April 11, 1989. *Id.*

Teahan sued Metro-North, alleging that his dismissal violated the Rehabilitation Act.[2] Teahan alleged that his absenteeism was

---

[2] The Rehabilitation Act is considered generally as a predecessor to the ADA, and cases under the Rehabilitation Act are relevant to the ADA. *See, e.g., Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1060 n.4 (5th Cir. 1997) (citing 36 Fed. Reg. 35544, 35545 (1991)). *But see Washington v. HCA Health Services of Texas, Inc.*, 152 F.3d 464, 470 n.9 (5th Cir. 1998) ("A case decided under the Rehabilitation Act is not controlling over the legislative history and administrative guidelines of the ADA. . . .").

caused solely by his alcoholism; since the Second Circuit considered alcoholism a handicap under the Rehabilitation Act, Teahan alleged that Metro-North fired him solely by reason of his handicap. Like the current ADA, the Rehabilitation Act did not protect "an alcoholic whose current use of alcohol prevents such individual from performing the duties of the job in question." *See Teahan*, 951 F.2d at 51 n.1 (discussing 1990 Amendments to the Rehabilitation Act of 1973, 29 U.S.C. § 794, § 706(8)). The case therefore turned on whether Teahan was a current abuser of alcohol at the relevant time.

Metro-North asked the court to consider Teahan's status as a current alcohol abuser on December 28, 1987, at which time Metro-North began procedures to fire Teahan, although it was legally unable to do so until April 11, 1989. *See Teahan,* 951 F.2d at 517. The Second Circuit disagreed, and decided instead to focus on the date on which Teahan was actually fired. The court reasoned that the word "current" within the statute prohibited an employer from firing an employee based on past substance abuse problems that the employee had overcome. That court feared that Metro-North's theory would create a loophole which would expose recovering substance abusers to retroactive punishment. Therefore, the court looked to the April 11, 1989, actual termination date to determine whether the drug use was current. *Id.; accord, Dauen v. Board of Fire and Police Commissioners of the City of Sterling, Ill.*, 656 N.E.2d 427

10

(Ill. App. Ct. 1995) (following *Teahan*); *D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998).

This Court has already, at least implicitly, rejected the Second Circuit's approach.[3]  *See McDaniel v. Mississippi Baptist Medical Center*, 877 F.Supp. 321 (S.D. Miss. 1995) (interpreting current user provision under the ADA), *aff'd* 74 F.3d 1238 (5th Cir. 1995) (table)[4].  McDaniel was a recovered substance abuser who worked as an adolescent marketing representative for a substance abuse recovery program.  On or around September 2, 1992, McDaniel voluntarily entered a rehabilitation program after suffering a relapse.  On September 1, the day before McDaniel entered the program, McDaniel's employer notified him that he would not return to his current position but might be transferred within the company.  The employer subsequently fired McDaniel on September 20, 1992.  *See id.* at 324-26.

McDaniel argued that he was not a current drug user on September 20, the date he was fired, and therefore he was protected

---

[3]    We note that our disagreement with the *Teahan* case is only with the narrow aspect of identifying the relevant date by which to determine whether an employee is a current user of illegal drugs.

[4]    On the appeal of the plaintiff McDaniel, this Court, in an unpublished opinion issued December 8, 1995, affirmed "essentially on the authorities cited and analysis made by the district court" in its opinion.  *McDaniel v. Mississippi Baptist Medical Center*, No. 95-60038 (5th Cir. Dec. 8, 1995).  As this Court's opinion, though unpublished, was issued before January 1, 1996, it is precedential and binding on this panel.  5th Cir. R. 47.5.3.

by the ADA.[5]   The court disagreed, finding that the relevant adverse employment action was conveyed to McDaniel on September 1, before he entered the rehabilitation program.  *See id.*  At that time, McDaniel was a current user of illegal drugs.  *Id.*[6] *See also Grimes v. U.S. Postal Serv.*, 872 F. Supp. 668, 675 (W.D. Mo. 1994) (rejecting actual termination date as relevant point of inquiry where plaintiff had been arrested for drug possession in January but termination was not finalized until April).

Similarly, the relevant adverse employment action in this case occurred on September 20, 1995, when Quintana and Mendoza informed Zenor that he would be terminated upon the expiration of his medical leave.  We do not share the Second Circuit's fear that considering the notification date, rather than the actual termination date, creates a loophole by which employers can punish recovered addicts. There is nothing to suggest that Columbia was in any way punishing Zenor.  Instead, Columbia was carrying out its rational and legally sound decision not to employ illegal cocaine users in its hospital pharmacy.

Looking to the notification of termination date provides a fair remedy both to the employer and employee.  Otherwise, in this case, Columbia would effectively be penalized for allowing Zenor to

---

[5]    McDaniel in fact argued that he fell within the statute's safe harbor, discussed *infra*.

[6]    We observe that neither the district court's nor this Court's opinion in *McDaniel* cites *Teahan*.

12

take a medical leave of absence rather than terminating him right away. Such a ruling would encourage employers in Columbia's position to hasten effectuation of employment decisions, which could have adverse effects for employees who would benefit from remaining in an employee status, such as by retaining employer-provided health and insurance benefits, during their recovery programs.

Zenor suggests that he did not know with certainty whether he would be fired on September 20. However, this argument is untenable. Columbia representatives undisputably told Zenor he was being terminated September 20. Indeed, Zenor's counsel argued such to the jury in his closing argument: "They came to the Landmark Center on September 20th of 1995, and they told him, Mr. Zenor, we know we've made some promises, but we're going to fire you anyway." Zenor admits in his testimony that at this September 20 meeting "they said they were planning to terminate me." Zenor's witness Guy, Landmark's director present at the meeting on Zenor's behalf, testified on direct examination that at the meeting Columbia's "Mrs. Mendoza repeated the fact that he [Zenor] would not be taken back on staff there upon completion of the program" and that he protested but the meeting "broke up with Tom [Zenor] was still not going back to Columbia." On cross-examination, Guy agreed "there was no doubt in your mind at the end of that meeting on September 20th, that Columbia intended to fire Mr. Zenor." Furthermore, Guy's letter dated September 21, written on Zenor's behalf and

13

calling Columbia's action unfair, also reflects that Zenor understood that he was being fired.

Nonetheless, Zenor persists in disputing that he understood the meaning of those statements. Zenor testified that although he was told on September 20 that he would be fired, he retained "the impression" that he "might" get his job back because "she [Mendoza] didn't say it was written in stone at that point that I might be, you know. She didn't say, you definitely will not get your job back." Such speculation or confusion on Zenor's part was unreasonable and cannot be attributed to any action or inaction by Columbia. Finally, Zenor suggests that he was surprised and "emotionally destroyed" to receive his termination letter on November 24. This is likewise legally unavailing in light of the foregoing and the undisputed evidence that Mendoza wrote that letter at Zenor's request, in order to help Zenor continue his health care benefits.

Columbia decided to terminate Zenor on or before September 20, 1995, and that decision was adequately conveyed to Zenor on September 20, 1995. The relevant employment action for Zenor's ADA case thus occurred on September 20, 1995. Therefore, the question is whether Zenor, who had used cocaine on August 15, 1995, was currently engaging in the illegal use of drugs when Columbia informed him on September 20, 1995, of its decision to terminate him. We conclude, as a matter of law, that he was.

Under the ADA, "currently" means that the drug use was

14

sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem. *See* 143 Cong. Rec. H 103-01 (1997). Thus, the characterization of "currently engaging in the illegal use of drugs" is properly applied to persons who have used illegal drugs in the weeks and months preceding a negative employment action. *Shafer v. Preston Memorial Hospital Corp.*, 107 F.3d 274, 278 (4th Cir. 1997); *Collings v. Longview Fibre Co.*, 63 F.3d 828 (9th Cir. 1995); *McDaniel.*

In *McDaniel*, the district court held that an individual who had used drugs six weeks prior to being notified of his termination was not protected by the ADA. *Accord*, *Baustian v. Louisiana*, 910 F.Supp. 274, 276-77 (E.D. La. 1996) (finding plaintiff who had used drugs seven weeks before termination to be a current drug user), *reconsideration denied*, 929 F.Supp. 980 (E.D. La. 1996). The Fourth and Ninth Circuits have similarly concluded that persons who had used illegal drugs in the weeks and months prior to being fired from their jobs were current drug users for purposes of the ADA. *See Shafer v. Preston Memorial Hospital Corp.,* 107 F.3d 274, 278 (4th Cir. 1997); *Collings*, 63 F.3d at 833. "Therefore, the fact that the employees may have been drug-free on the day of their discharge is not dispositive." *Id.*

In *Shafer*, the Fourth Circuit interpreted the phrase "currently engaging in the illegal use of drugs" to encompass a woman who had used illegal drugs approximately three weeks before

15

she was fired from her job, and had in the interim enrolled in a rehabilitation program. The plaintiff in that case argued that the term current should mean, "at the precise time," or "at the exact moment." *Id.* at 277. The Fourth Circuit rejected that interpretation. The term "currently," when modifying the phrase "engaging in the illegal use of drugs" should be construed in its broader sense, "mean[ing] a periodic or ongoing activity in which a person engages (even if doing something else at the precise moment) that has not yet permanently ended." *Shafer*, 107 F.3d at 278. Indeed, "the ordinary or natural meaning of the phrase ‹currently using drugs' does not require that a drug user have a heroin syringe in his arm or a marijuana bong to his mouth at the exact moment contemplated." *Id.* Thus, the plaintiff who had engaged in illegal drug use three weeks before her termination was currently engaging in illegal drug use at the time she was fired.

These holdings reflect Congress's unambiguous intent that "[t]he [current user] provision is not intended to be limited to persons who use drugs on the day of, or within a matter of days *or weeks* before, the employment action in question." H.R. Rep. No. 101-596, at 64 (1990) (emphasis added). *See also* 143 Cong. Rec. H 103-01 (1997) ("Current illegal use of drugs means illegal use of drugs that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem.").

16

The EEOC Compliance Manual on Title I of the ADA also supports this interpretation.

> "'Current' drug use means that the illegal use of drugs occurred recently enough to justify an employer's reasonable belief that involvement with drugs is an on-going problem. It is *not limited to* the day of use, or *recent weeks* or days, in terms of an employment action. It is determined on a case-by-case basis." EEOC-M-1A Title VIII § 8.3 Illegal Use of Drugs (emphasis added).

Additionally, the Second Circuit has suggested several factors which courts should examine to determine whether a person is a current substance abuser, including "the level of responsibility entrusted to the employee; the employer's applicable job and performance requirements; the level of competence ordinarily required to adequately perform the task in question; and the employee's past performance record." *See Teahan*, 951 F.2d at 520; *D'Amico*, 132 F.3d at 150. Rather than focusing solely on the timing of the employee's drug use, courts should consider whether an employer could reasonably conclude that the employee's substance abuse prohibited the employee from performing the essential job duties. *See Teahan*, 951 F.2d at 520.

Zenor admits to having used cocaine as much as five times a week for approximately two years and to having been addicted. On September 20, 1995, Zenor had refrained from using cocaine for only five weeks, all while having been hospitalized or in a residential program. Such a short period of abstinence, particularly following such a severe drug problem, does not remove from the employer's

17

mind a reasonable belief that the drug use remains a problem. Zenor's position as a pharmacist required a great deal of care and skill, and Zenor admits that any mistakes could gravely injure Columbia's patients. Moreover, Columbia presented substantial testimony about the extremely high relapse rate of cocaine addiction. Zenor's own counselors, while supportive and speaking highly of Zenor's progress, could not say with any real assurance that Zenor wouldn't relapse. Finally, Columbia presented substantial evidence regarding the on-going nature of cocaine-addiction recovery. The fact that Zenor completed the residential portion of his treatment was only the first step in a long-term recovery program. Based on these factors, Columbia was justified in believing that the risk of harm from a potential relapse was significant, and that Zenor's drug abuse remained an ongoing threat.

Nonetheless, Zenor argues that because he voluntarily enrolled in a rehabilitation program, he is entitled to protection under the ADA's "safe harbor" provision for drug users. The safe harbor provides an exception to the current user exclusion of 42 U.S.C. § 12114(a) for individuals who are rehabilitated and no longer using drugs. *See* 42 U.S.C. § 12114(b):

> "(b) Rules of construction. Nothing in subsection (a)
> shall be construed to exclude as a qualified individual
> with a disability an individual who—
>        "(1) has successfully completed a supervised
>        drug rehabilitation program and is no longer
>        engaging in the illegal use of drugs, or has

18

> otherwise been rehabilitated successfully and
> is no longer engaging in such use; [or]
> "(2) is participating in a supervised
> rehabilitation program and is no longer
> engaging in such use . . . ."

However, the mere fact that an employee has entered a rehabilitation program does not automatically bring that employee within the safe harbor's protection. *McDaniel*, 877 F.Supp. at 327-28. *See also Shafer*, 107 F.3d at 278; H.R. Conf. Rep. No. 101-596, at 64 ("This provision does not permit persons to invoke the Acts [sic] protection simply by showing that they are participating in a drug treatment program."). Instead, the House Report explains that the safe harbor provision applies only to individuals who have been drug-free for a significant period of time. *See id.* ("On the other hand, this provision recognizes that many people continue to participate in drug treatment programs *long after they have stopped using drugs illegally*, and that such persons should be protected under the Act.") (emphasis added).

Zenor argues that he should be protected by the safe harbor provision because he "self-reported" his addiction and voluntarily entered the rehabilitation program. At least one court has distinguished employees who voluntarily seek help for their addictions from those employees who are caught by employers using drugs. *See Grimes v. U.S. Postal Serv.*, 872 F. Supp. 668, 675 (W.D. Mo. 1994) (denying federal employee's Rehabilitation Act claim after employee was caught selling marijuana and noting that

19

the Act "is designed to protect a drug addict who voluntarily identifies his problem, seeks assistance, and stops using illegal drugs.").

However, other courts have rejected the proposition that a "chemically dependent person . . . who is currently engaging in illegal drug use[] can escape termination by enrolling himself in a drug treatment program before he is caught by the employer." *McDaniel* 877 F.Supp. at 326; *Baustian v. Louisiana*, 901 F.Supp. 274 (E.D. La. 1996) (holding that being drug free for seven weeks did not satisfy statute's safe harbor provision even though plaintiff had enrolled in rehabilitation program); *Shafer*, 107 F.3d at 278 (rejecting plaintiff's argument that she could not be fired after being caught with drugs merely because she enrolled in rehabilitation program before termination took effect). These holdings better align with Congress' explicit statement that a plaintiff may not evade termination merely by entering into a rehabilitation program, without first showing a significant period of recovery. Thus, to the extent that Zenor's claim of "self-reporting" is genuine, it does not propel Zenor into the safe harbor's protection simply because he had entered a rehabilitation program before the adverse employment action was taken.

For similar reasons, Columbia was free to find that Zenor was not a "qualified individual" even in the absence of the statutory exclusion for illegal drug users. A qualified individual under the

ADA must be able to perform essential job requirements. *See* 42 U.S.C. § 12111. The ADA directs courts to consider employers' definitions of essential job requirements. *See* 42 U.S.C. § 12111(8). Columbia reasonably may have felt that having a pharmacist who had recently been treated for cocaine addiction undermined the integrity of its hospital pharmacy operation. *See McDaniel*, 877 F.Supp. at 328 (finding it "not unreasonable or beyond the reach of the ADA for the Defendant [addiction recovery center] to find that it was essential to the performance of the marketing job not to have a recently relapsed person holding that job."). *See also Copeland v. Philadelphia Police Dept*, 840 F.2d 1139, 1149 (3d Cir. 1988) (under Rehabilitation Act, illegal drug user was not qualified for position of police officer because accommodation would be substantial modification of job and cast doubt on department's integrity). *Cf. Davis v. City of Dallas*, 777 F.2d 205, 223-25 (5th Cir. 1985) (disqualification of police officer applicants for prior recent or excessive marijuana use supported by business necessity despite racially disparate impact). Such conclusions do not violate the ADA.

Columbia was also entitled to consider the relapse rate for cocaine addiction in determining that Zenor was not qualified to work as a pharmacist. *See Teahan*, 951 F.2d at 520 (directing courts to consider the likelihood of relapse in considering whether a recovering addict was "otherwise qualified" for a particular

position.)  As noted, cocaine addiction has a very high relapse rate, and the risk of harm from a potential relapse was great.  *See D'Amico*, 132 F.2d at 151 (holding plaintiff's history of cocaine addiction coupled with risks inherent in potential relapse justified city's termination of firefighter).[7]

Finally, this evidence should be viewed in light of what was known to Columbia on the date it fired Zenor.  *See Teahan*, 951 F.2d at 521 (holding that inquiry into whether employee is otherwise qualified is "forward-looking").  Thus, the fact that Zenor has not thereafter relapsed does not affect the reasonableness of Columbia's decision on September 20, 1995.

As an alternate basis for our holding, we determine that Zenor was not disabled within the meaning of the ADA.  The ADA defines disability, in relevant part, as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual."  42 U.S.C. § 12102(2)(A).[8]  Alternatively, a

---

[7]    Columbia also raises a serious question as to whether Zenor could have retained his pharmacy license.  All pharmacists practicing in Texas must be licensed by the Texas State Board of Pharmacy (Board).  At the time Zenor was fired, Columbia reported his cocaine addiction to the Board.  The Board apparently began an investigation, but, when Zenor subsequently failed to renew his license, the investigation ceased.  Clearly, one who is not licensed cannot be considered "otherwise qualified" for the position of pharmacist.

[8]    Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  *See Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 50 (5th Cir. 1998), *citing* 29 C.F.R. § 1630.2(i).

person may establish that she suffers from a disability if she has either "a record of such an impairment," 42 U.S.C. § 12102(2)(B), or "[is] regarded as having such an impairment," 42 U.S.C. § 12102(2)(C). Zenor argues that he was perceived as being a drug addict and therefore established a disability under the ADA. *See* 42 U.S.C. § 12102(2)(C). Thus, Zenor's claim falls under the third "regarded as" or "perception" category.

Under this "regarded as" or "perception" prong, a person will be treated as having a "substantially limiting impairment" if he shows that he:

> "(1) has an impairment which is not substantially limiting but which the employer perceives as constituting a substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment." *Deas v. River West, L.P.,* 152 F.3d 471, 475 (5th Cir. 1998), quoting *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996).

Zenor's claim falls under the third sub-prong of perception cases: Zenor argues that he was not a current drug user, but was regarded by Columbia as a drug addict. Zenor thus attempts to establish a disability by citing testimony that Columbia officials regarded him as an addict.

However, Zenor's burden under the ADA is not satisfied merely by showing that Columbia regarded him as a drug addict: the fact that a person is perceived to be a drug addict does not necessarily mean that person is perceived to be disabled under the ADA. *See*

23

*Equal Employment Opportunity Commission v. Exxon Corp.*, 973 F. Supp. 612 (N.D. Tex. 1997) (holding that rehabilitated substance abusers are not automatically disabled but still "must prove they suffer from a 'disability' as that term is defined in 42 U.S.C. § 12102(2)."), *citing Burch*, 119 F.3d at 320-321; *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 395 (5th Cir. 1995). Zenor must also show that Columbia regarded Zenor's addiction as substantially limiting one of Zenor's major life activities. See 29 C.F.R. § 1630.3 (noting that safe harbor provision "simply provides that certain individuals are not excluded from the definitions of 'disability' and 'qualified individual with a disability.' Consequently, such individuals are still required to establish that they satisfy the requirements of these definitions in order to be protected by the ADA and this part.").[9] *See also Deas v. River West*, *L.P.,* 152 F.3d 471 (5th Cir. 1998) (rejecting argument that employer regarded plaintiff as disabled merely because employer regarded plaintiff as suffering from seizure disorder); *Bridges v. City of Bossier*, 92 F.3d 329, 336 n.11 (5th Cir. 1996) (hemophilia).

---

[9] The regulation goes on to state, "An individual erroneously regarded as using illegal drugs, for example, would have to show that he or she was regarded as a drug addict in order to demonstrate that he or she meets the definition of 'disability' as defined in this part." 29 C.F.R. § 1630.3. We do not read this statement, however, to lessen the individual's burden of proving that the addiction was perceived to be substantially limiting in a major life activity.

In *Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997), this Court held that alcoholism is not a disability *per se* under the ADA. The ADA requires an individualized inquiry to determine whether a particular plaintiff is disabled. *See id.* at 315 ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."), quoting 29 C.F.R. Pt. 1630, App. (internal quotation marks omitted). Thus, even a plaintiff who suffers from a condition such as alcoholism or drug addiction—or is perceived as suffering from such a condition—must demonstrate that the condition substantially limits, or is perceived by his employer as substantially limiting, his ability to perform a major life function.

The alcoholic plaintiff in *Burch* produced no evidence that his alcoholism affected him in any way qualitatively different from the effect of alcohol on an "overindulging social drinker." *See Burch*, 119 F.23d at 316. The fact that Burch felt the inebriating effects of alcohol more frequently than a social drinker did not transform his problem into a permanent impairment. Furthermore, this Court refused to hold that the mere fact that Burch had undergone hospitalization for alcoholism necessarily gave rise to a disability, or a record of disability. *See id.* at 317. Instead, we required Burch to prove that his alcoholism substantially

25

limited a major life activity, which Burch failed to do.  *See id.* at 318, n.10 ("Wherever Congress's sympathies lie, we find no evidence in the legislative history or elsewhere of a congressionally conferred exemption for alcoholics from the rigors of the scheme set forth in the ADA.").  *But see Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996) (noting that "alcoholism and other forms of addiction are disabilities within the meaning of the ADA"); *Shafer,* 107 F.3d at 277 ("The parties do not dispute that drug addiction is a disability.").

Zenor argues that Columbia perceived him as substantially limited in the major life activity of working.  In this context, "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 805 (5th Cir. 1997), quoting 29 C.F.R. § 1630.2(j)(3) (1996) (internal quotation marks omitted).  The inability to perform one specific job or a narrow range of jobs does not constitute substantial limitation on one's ability to work.  *Id.  See also Deas v. River West, L.P.,* 152 F.3d 471 (1998); *Bridges*, 92 F.3d at 335.

In *Deas*, a perception case such as this one, we held that a seizure disorder was not a substantial limitation on the plaintiff's ability to work, despite the fact that it prevented her

26

from working in her desired field. The employer in *Deas* believed that the plaintiff's seizure disorder prohibited her from working as an Addiction Technician in a substance abuse clinic, a job which required "uninterrupted awareness or vigilance." *Deas*, 152 F.3d at 481. In her disability discrimination suit, however, the plaintiff presented no evidence that her employer regarded her as unable to perform any job other than the specific position of an Addiction Technician in a substance abuse clinic. Therefore, this Court affirmed the lower court's summary judgment for the employer, finding no evidence from which a reasonable jury could infer that the employer regarded Deas as substantially limited in her ability to work. *Deas*, 152 F.3d at 482.

Similarly, in *Bridges* we held that hemophilia was not a disability under the ADA merely because it prevented the plaintiff from pursuing his chosen line of work as a firefighter. The City refused to hire Bridges as a firefighter because it believed his hemophilia would render him a risk to himself and others were he to come into contact with the extreme trauma routinely encountered in firefighting. *Id.* at 329. We approved the district court's grant of judgment for the City, finding that the City perceived Bridges to be unable to perform only a narrow and limited class of jobs: firefighting. Bridges asserted that the City also prevented him from becoming a municipal Emergency Medical Technician (EMT) or a municipal paramedic, since both municipal EMT's and municipal

27

paramedics serve as back-up firefighters. Nonetheless, we held that one who is prohibited from performing only the jobs of firefighter or back-up firefighter-EMT (or paramedic) is not disqualified from holding a broad range of jobs. *See id.* at 334 ("A 'broad range' [of jobs] implies more than two job types.") (citing 29 C.F.R. Pt. 1630.2(j), App.). *See also Talk v. Delta Air Lines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) ("evidence of disqualification from a single position or a narrow range of jobs will not support a finding that an individual is substantially limited from the major life activity of working").

Likewise, Zenor presented no evidence that Columbia regarded him as limited in his ability to work in a broad range of jobs. Zenor does not argue that he was qualified for, or sought, alternative employment positions at Columbia other than as pharmacist. Nor is there any evidence that Columbia perceived Zenor as unable to perform any number of clerical, service-related, administrative, or even other medical positions within the hospital. As discussed above, Columbia maintained a policy of returning some employees to work after they had undergone addiction rehabilitation programs. Clearly, therefore, Columbia does not view all persons with drug-related problems as substantially limited in their ability to work. Here, however, Columbia felt that a recent cocaine addict was unqualified for one specific job: that of a pharmacist. Columbia was entitled to conclude that if a

28

person is a pharmacist, cocaine addiction is not acceptable.

As Zenor presented no evidence from which a reasonable jury could conclude that Columbia perceived Zenor's addiction to substantially impair his ability to work in a broad range or class of jobs, Zenor failed to establish that he was regarded as suffering from a disability within the meaning of the ADA. Nor, for the reasons discussed above, could a reasonable jury find that Zenor was an "otherwise qualified individual" for the position of a pharmacist. Therefore, the district court correctly granted judgment as a matter of law for Columbia on Zenor's ADA claim.

II.  Breach of Contract

The district court was also correct in granting judgment as a matter of law against Zenor's breach of contract claim. Zenor was an at-will employee, and could be fired at any time and for any lawful reason. Columbia's "Drug-Free/Alcohol-Free Workplace Policy" (Policy) in no way altered Zenor's at-will employment status.

Columbia distributed copies of the Policy to its employees, including Zenor, in 1993. The Policy prohibits the off-duty use of drugs or alcohol if, in the opinion of Columbia management, that use either impairs the employee's performance or affects the company's reputation or integrity. The policy states employees who violate the policy may be terminated, or *at the company's discretion*, may be required to complete a rehabilitation program

"as a condition of continued employment." Zenor admits that he violated the Policy by bringing Columbia's image into disrepute. However, Zenor argues that Columbia was nonetheless obligated to return him to work after he completed the rehabilitation program.

The ACCESS portion of the Policy states in part:

> "[a]ny employee found to be using drugs or alcohol whose tests have been verified positive, shall be referred to the Employees Assistance Program [EAP]. The EAP provides assistance by:
> . . . .
> (f) Returning the employee back to the job (subject to availability) after successful completion of treatment."

Under the section of the Policy discussing drug-testing procedures, and the sub-section entitled "disciplinary actions," the Policy states: "Employees who test positive for drugs or alcohol will automatically be referred to the Employee Assistance Program, ACCESS, for counseling. Successful completion of a rehabilitation program will be a condition for continued employment." Finally, under its section entitled "Rehabilitation," the Policy states: "Return to work. Employees who successfully complete rehabilitation will be returned to their same or similar position."

Zenor was an at-will employee. Columbia's Employee Handbook, which Zenor received in 1991 when he began his employment, emphasized the at-will nature of Zenor's employment and stated that employees could be fired any time and for any reason not prohibited by law. The handbook expressly disclaimed the creation of any

30

contractual obligations.

Texas law imposes a strong presumption in favor of at-will employment. *See, e.g., Montgomery County Hospital District v. Brown*, 965 S.W.2d 501 (Tex. 1998) (absent an express agreement to the contrary, Texas law presumes an at-will relationship between an employer and employee); *Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282 (Tex. 1993). Nonetheless, Texas courts have recognized that employment policies may, in limited circumstances, alter the at-will nature of the employment and create enforceable contractual rights. *See Vida v. El Paso Employees' Federal Credit Union*, 885 S.W.2d 177 (Tex. App.--El Paso 1994, no writ). To create contractual rights, the policy must specifically and expressly limit the employer's ability to terminate the employee. *See id.* at 182. *See also Figueroa v. West*, 902 S.W.2d 701, 704 (Tex. App.-- El Paso 1995, no writ). The policy must contain an explicit contractual term altering the at-will relationship, and must alter that relationship "in a meaningful and special way." *See id.* at 705. Texas courts have been reluctant to imply contractual rights from non-explicit statements or employment policies. *See, e.g., Figueroa,* 902 S.W.2d at 704.

For example, *Vida* involved an employee who filed a grievance according to the company's internal grievance procedure. *See Vida*, 885 S.W.2d at 179. After she was subsequently fired, Vida sued the company for wrongful discharge. The employer had a written policy

31

stating that "'[n]o employee shall be penalized for using its grievance procedure.'" *Id.* at 181. The policy narrowly and explicitly restricted the employer's right to terminate an employee for using the grievance procedure. *See id.* ("Although the at-will doctrine still governed the relationship between plaintiff and defendant in most areas, the employer made a specific pledge that it would not terminate (or otherwise retaliate against) an employee for a single, particular reason."). Therefore, the court construed the policy as a valid alteration of the parties' at-will employment status.

Zenor argues that the Policy created an express agreement altering the at-will relationship between Zenor and Columbia. Zenor points to language in the Policy stating that employees who successfully complete the rehabilitation program may return to work. Zenor argues that these statements created enforceable contract rights, prohibiting Columbia from terminating employees who successfully complete rehabilitation.

However, on the very first page of the Policy, Columbia explicitly retains the discretion to decide whether to terminate the employee or allow the employee to return to work, by there stating:

> "Employees who violate any aspect of this policy *are subject to disciplinary action, up to and including termination* of employment. They *may* be required, *at the company's discretion*, to participate in, and successfully complete a drug abuse treatment or rehabilitation program as a condition of continued employment." (emphasis

32

added).

Thus, unlike the employer in *Vida*, Columbia made no promise that employees who disclose their addictions will automatically be returned to work. The decision is entirely left to Columbia's discretion. The Policy was unilaterally set by Columbia, and obligated Columbia to do very little. *See Figueroa*, 902 S.W.2d at 705. The fact that the Policy may in general encourage or favor rehabilitation of its employees does not in itself obligate Columbia. *Compare Vida*, 885 S.W.2d at 181 (finding an explicit assurance of the employer's intent to limit its right to fire an employee for a narrow and specific reason) *with Montgomery County Hospital District v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998) (holding that general assurances of job security, and even promises that an employee will be fired only "for cause" or "for good reason" will not, without more, create a contractual relationship).

Any promise to allow the employee to return to work is ambiguous and inferential at best. Texas courts will not find contractual employment rights on such a basis. *See, e.g., Vida*, 885 S.W.2d at 182; *Figueroa*, 902 S.W.2d at 704.

Finally, *Vida* is distinguishable because the policy manual in that case contained no disclaimer of contractual rights, as does Columbia's Employee Handbook. Texas courts have held that a disclaimer such as that in Columbia's Employee Handbook negates the existence of any implied contractual rights. *See Figueroa*, 902

33

S.W.2d at 704.

> "In numerous cases, discharged employees have attempted to recover for breach of contract by alleging that their employers' personnel manuals contained enforceable promises altering the at-will relationship. [citations] Texas courts have generally rejected this theory, particularly where a specific disclaimer in the employee handbook warns the employee that the manual is intended to provide guidelines only and does not create contractual rights." *Id.*

The disclaimer supports the presumption that Columbia did not intend for its policies to create contractual rights.[10] This presumption has not been overcome by the ambiguous and contradictory Policy statements cited by Zenor.

We also note that Columbia did not require Zenor to complete the rehabilitation program as a condition of his continued employment. Zenor had already entered the detoxification unit and in fact had not contacted Columbia for eight days at the time of his August 23 conversation with Mendoza. Although Zenor contacted Mendoza to ask whether his job would be secure if he entered Landmark, Zenor testified that his decision to enter Landmark had

---

[10] The fact that the disclaimer is located in a different document from the Policy does not alter this conclusion. The disclaimer did not limit itself to the words contained in the Employee Handbook, and the Handbook acknowledges that it is not a complete statement of company policy. Other statements of company policy are incorporated into the Handbook, and subject to the Handbook's disclaimer. Moreover, the Policy itself incorporates the Handbook through the inclusion of an "Informed Consent for Drug/Controlled Substance/Alcohol Testing" form which all employees, including Zenor, were required to sign. The form incorporates the Handbook by requiring employees to certify that they had read and understood, among other documents, the Policy *and* the employee Handbook.

already been made at that time, and he would have entered Landmark and completed the program there even if Mendoza had told him on August 23 that he was terminated.  Moreover, Zenor did not contact ACCESS director Joe Provencio about his addiction, and never in fact participated in the ACCESS program, despite Quintera's recommendation that he do so.  The Policy, however, does not speak to substance abuse recovery programs generally, but only addresses Columbia's ACCESS program.

III. Promissory Estoppel

The district court allowed Zenor's promissory estoppel claim to go to the jury, and the jury returned a substantial award for Zenor.  Afterwards, the court granted Columbia's renewed motion for judgment as a matter of law, holding that Columbia made no promise upon which Zenor could reasonably rely.

Texas courts apply the *Restatement* definition of promissory estoppel.  *See, e.g., Trammel Crow Co. No. 60 v. William Jefferson Harkinson and Jeff Harkinson Investments, Inc.,* 944 S.W.2d 631 (Tex. 1997);  *"Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934, 937 (Tex. 1972).  "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee [or a third party] and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Id.*, quoting *Restatement (Second) of Contracts*, § 90.  Thus,

35

promissory estoppel has four elements under Texas law: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment . . . . [and (4)] a definite finding that injustice can be avoided only by the enforcement of the promise." *Clardy Manufacturing Co. v. Marine Midland Business Loans, Inc.*, 88 F.3d 347, 360 (5th Cir. 1996) (internal citations and quotation marks omitted).[11]

Contrary to Zenor's assertions, the Policy does not promise to continue an employee's employment after the employee self-reports a drug addiction. Instead, as discussed above, the Policy states Columbia's option of terminating that employee or allowing the employee to return to work upon completion of a rehabilitation

---

[11] Zenor argues that Texas law does not impose the fourth requirement of a finding that justice requires enforcement of the promise. Some Texas courts have listed only the first three elements of promissory estoppel, *see Central Texas Micrographics v. Leal*, 908 S.W.2d 292 (Tex. App.--San Antonio, 1995, no writ) ("The elements of promissory estoppel are: (1) a promise, (2) foreseeabliity of reliance on the promise by the promisor, and (3) substantial detrimental reliance by the promisee."), citing *English v. Fischer*, 600 S.W.2d 521, 524 (Tex. 1983). However, even cases listing only these three elements of promissory estoppel have recognized that estoppel applies to prevent injustice. *See, e.g., Sipco Services Marine, Inc. v. Wyatt Field Service Co.*, 857 S.W.2d 602, 605 (Tex. App.--Houston (1st Dist.), 1993, writ ref'd n.r.e.) ("The promise will be enforced if necessary to avoid injustice"); *Donaldson v. Lake Vista Community Improvement Assoc.*, 718 S.W.2d 815, 817 (Tex. App.--Corpus Christi, 1986, writ ref'd n.r.e.) ("Estoppel is a doctrine to prevent injustice."). Finally, the Texas Supreme Court in 1997 reiterated its adherence to the *Restatement (Second)* definition of promissory estoppel, which states that a promise will be binding "if injustice can be avoided only by enforcement of the promise." *See Trammel Crow Co. No. 60 v. William Jefferson Harkinson and Jeff Harkinson Investments, Inc.,* 944 S.W.2d 631 (Tex. 1997) (citations omitted).

program. While the Policy may encourage employees to seek assistance, it does not proscribe Columbia's legal options once that happens.

Further, it is questionable whether Texas law allows at-will employment to form the basis of a promissory estoppel claim. In *Roberts v. Geosource Drilling Services, Inc.*, 757 S.W.2d 48 (Tex. App.--Houston (1st Dist.) 1988, no writ), an employee quit his job and prepared to move overseas in reliance on an employer's promise of overseas employment. The employer later repudiated the agreement. The Houston 1st District Court of Appeals held that the employee's at-will status did not prevent his recovery under a promissory estoppel theory. "It is no answer that the parties' written contract was for an employment-at-will, where the employer foreseeably and intentionally induces the prospective employee to materially change his position to his expense and detriment, and then repudiates its obligations before the written contract begins to operate." *See id.* at 50.

However, *Roberts* has not been universally accepted in Texas appellate courts. The Houston 14th District Court of Appeals disagreed with *Roberts* in *Collins v. Allied Pharmacy Management, Inc.*, 871 S.W.2d 929 (Tex. App.--Houston (14th Dist.) 1994, no writ). *Collins* held that a promise to provide future at-will employment cannot form the basis of a promissory estoppel claim. The *Collins* court reasoned that an at-will relationship creates no

37

assurances about future employment, because the employee could be fired at any time. Any promise of employment is illusory, and reliance on such a promise is therefore unjustified. *See Collins*, 871 S.W.2d at 937 ("Appellants relied upon an employment agreement for no specific length of time and with no clear limit on the employer's freedom of action; accordingly, any promise was illusory and reliance on it was based upon appellant's subjective expectations and was unjustified."). Therefore, the at-will employment relationship could not form the basis of a promissory estoppel claim as a matter of law. *See id.* *Collins* explicitly rejected *Roberts*, stating:

> "In our opinion, Roberts was wrongly decided; no Texas cases have cited it and we decline to follow it. Rather, we believe Roberts abrogates the employment at will doctrine in all cases where the employee must quit an existing job to find a new offer of employment. Also, we find it would be illogical to hold that an employee has no remedy if he is fired one week after commencing work, but may recover damages if the employer refuses to allow him to commence work at all. *Id.* (citation omitted).

*See also Patterson v. Leal*, 942 S.W.2d 692 (Tex. App.--Corpus Christi, 1997, writ denied) (recognizing disagreement between *Collins* and *Roberts*).

We do not, however, undertake to resolve the conflict between *Collins* and *Roberts*. Under the undisputed evidence here, Zenor's reliance on the Policy was unreasonable as a matter of law. The Policy did not limit Columbia's discretion to terminate Zenor. Zenor has pointed to no place in the policy which contained any

38

exception for violators who "self-report" their transgressions. Zenor alleges that Mendoza encouraged Columbia employees to take advantage of the EAP and seek help for their problems. However, these statements do not specifically or meaningfully alter Columbia's discretion to terminate Policy violators. *See Brown*, 965 S.W.2d 501.

In any event, justice does not require the enforcement of any such "promise." In essence, Zenor's claim is *only* that Columbia's promise of continued employment induced him to *disclose* his addiction to his supervisors.[12] However, Zenor had concealed his cocaine addiction from Columbia for two years, and revealed his addiction only at a time when he felt that his drug use threatened serious and immediate medical consequences. Zenor's argument that he could have otherwise fabricated a reason for his inability to report to work does not persuade us that justice requires that Zenor should be insulated from termination for his cocaine use and addiction.

As the district court correctly observed,

"In the case at hand, Zenor essentially claims that, if Columbia did not honor its alleged promises in the drug policy, Zenor would have continued to conceal his drug use from Columbia and would not have self-reported to rehabilitation. To be sure, the Court cannot in good conscience enforce a 'promise' which would in effect shift the blame of an employee's continued drug dependency on the employer rather than where

---

[12] Zenor does not in any way complain of his drug rehabilitation program as such. See note 13 *infra*.

39

responsibility for the dangerous habit rightfully lies:
on the employee with the drug addiction."

We agree, and refuse to require a hospital to indefinitely continue its employment of a cocaine-addicted pharmacist.

Finally, Zenor has produced no sufficient evidence that he suffered any damages legally available under a promissory estoppel theory of recovery. Under Texas law, only reliance damages are recoverable for a promissory estoppel claim. *See Central Texas Micrographics v. Leal*, 908 S.W.2d 292, 297 (Tex. App.--San Antonio 1995, no writ). The jury awarded Zenor damages for mental anguish, past lost earnings and/or benefits, and future lost earnings and/or benefits. These awards represent compensatory and expectancy interests; none can be categorized as reliance damages.[13]

Reliance damages seek to put the injured party in the position he would have been in had he not relied on the promise. *See Fretz Construction Co. v. Southern National Bank of Houston*, 626 S.W.2d 478 (Tex. 1982). *See also Restatement (Second) of Contracts* § 349 ("As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance

---

[13] Zenor does not claim he was in any way harmed by the drug rehabilitation program he underwent—indeed, he asserts he benefitted from it and he testified that on August 23, when he spoke to Mendoza (and Columbia then learned for the first time since August 15 where he was), he would have entered Landmark, as he did the next day, and completed its program regardless of whether he had then been told he could not return to Columbia. Nor does Zenor seek to recover any of the expenses of his drug rehabilitation program (or his detoxification).

40

interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed."). Zenor has not proven any actual reliance damages or out-of-pocket expenses. *Cf. Leal,* 908 S.W.2d at 299 (allowing recovery after employee took low-salaried position in reliance on promise of bonus).

Mental anguish damages are compensatory in nature, and do not represent an injured party's reliance on a promise. Therefore, they are not recoverable under promissory estoppel. *Cf. Deli v. University of Minnesota*, 578 N.W.2d 779 (Minn. Ct. App. 1998) (denying emotional distress damages under promissory estoppel theory). Texas law generally does not allow mental anguish damages for breach of contract. *See, e.g., Latham v. Costello*, 972 S.W.2d 66, 70 (Tex. 1998). This principle extends to promissory estoppel claims since promissory estoppel claims are contractual in nature. *See* Comment d to *Restatement (Second) Contracts*, § 90. Finally, Zenor's mental anguish was not a direct result of Zenor's reliance on the Policy, but was instead caused by losing his job. *See Federal Land Bank Assoc. v. Sloane*, 825 S.W.2d 439 (Tex. 1991) (denying mental anguish damages for action based on fraudulent misrepresentation, where parties' mental anguish was not based on the misrepresentation but instead on their failure to obtain the benefit of the bargain).

Neither can future lost earnings and/or insurance benefits be classified as reliance damages. Future earnings represent expectancy damages. Expectancy damages, which seek to give the injured-party the benefit of the bargain which should have been performed, are not recoverable under promissory estoppel.

Furthermore, Zenor had no right to continued employment with Columbia. Had Zenor not relied on the alleged promise, he would still be an at-will employee at Columbia. He could have been terminated at any time and for any lawful reason. Therefore, Zenor could not have proven that he was entitled to any future earnings because he had no guarantee of future employment. *See Jarboe v. Landmark Community Newspaper of Indiana*, 644 N.E.2d 118, 122 (Ind. 1994) ("In future wages, the employee has only an expectation of income, the recovery of which promissory estoppel will not support in an at-will employment setting."), citing *D & G Stout, Inc. v. Bacardi Imports*, 923 F.2d 566, 569 (7th Cir. 1991).

Nor can Zenor recover damages for past lost earnings and/or insurance benefits lost to date of trial under a promissory estoppel theory. Such an award necessarily presumes a term of employment during which time Columbia was prohibited from firing Zenor. *Contra Wilder v. Cody Country Chamber of Commerce*, 933 P.2d 1098 (Wyo. 1997) (allowing recovery where employer promised not to fire employee before certain date). To allow this measure of damages would directly contravene Texas' strong policy of

42

supporting at-will employment relationships.  Furthermore, for reasons already discussed in this opinion, Zenor could not have reasonably believed that his employment was secure for any given any period of time.

The district court did not err in granting Columbia's renewed motion for judgment as a matter of law on Zenor's promissory estoppel claim.

## Conclusion

For the reasons stated, Zenor has shown no error in the district court's grant of judgment as a matter of law in favor of Columbia on his ADA, contract, and promissory estoppel claims.  The district court's judgment dismissing Zenor's suit is accordingly in all things

AFFIRMED.